UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 08-1885
(1:08-cv-00249-LMB-TRJ)

CACI  INTERNATIONAL,  INCORPORATED;  CACI,  INCORPORATED  -
FEDERAL; CACI PREMIER TECHNOLOGY, INCORPORATED; CACI N.V.,

> Plaintiffs – Appellants,

v.

ST. PAUL FIRE AND MARINE INSURANCE COMPANY,

> Defendant – Appellee.

O R D E R

The court amends its opinion filed May 14, 2009, as follows:

On page 2, attorney information section, the names "Brian J. Gerling, HUNTON & WILLIAMS, LLP, McLean, Virginia, Reginald M. Skinner, HUNTON & WILLIAMS, LLP, Richmond, Virginia, for Appellee" are added at line 5.

For the Court - By Direction

/s/ Patricia S. Connor

Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CACI INTERNATIONAL,
INCORPORATED; CACI,
INCORPORATED - FEDERAL; CACI
PREMIER TECHNOLOGY,
INCORPORATED; CACI N.V.,

        *Plaintiffs-Appellants,*

        v.

ST. PAUL FIRE AND MARINE
INSURANCE COMPANY,

        *Defendant-Appellee.*

No. 08-1885

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(1:08-cv-00249-LMB-TRJ)

Argued: March 26, 2009

Decided: May 14, 2009

Before WILKINSON and SHEDD, Circuit Judges, and
David A. FABER, Senior United States District Judge for
the Southern District of West Virginia, sitting by
designation.

---

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Senior Judge Faber joined. Judge Shedd
wrote a dissenting opinion.

**COUNSEL**

**ARGUED:** John Edward Heintz, KELLEY, DRYE & WARREN, LLP, Washington, D.C., for Appellants. Walter J. Andrews, HUNTON & WILLIAMS, LLP, McLean, Virginia, for Appellee. **ON BRIEF:** David Laufman, KELLEY, DRYE & WARREN, LLP, Washington, D.C., for Appellants. Brian J. Gerling, HUNTON & WILLIAMS, LLP, McLean, Virginia, Reginald M. Skinner, HUNTON & WILLIAMS, LLP, Richmond, Virginia, for Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

CACI International ("CACI") appeals the district court's decision that its insurer, St. Paul Fire and Marine Insurance Company ("St. Paul"), had no duty to defend CACI against claims alleging torture and abuse at Abu Ghraib and other prisons in Iraq. CACI acknowledges that the insurance policies at issue in this case generally limit coverage to the United States and Canada. Still, CACI argues that some of the underlying claims implicate events that happened in the United States, and that other claims fall under an exception to the coverage provision for employees who were away from home for a "short time."

We agree with the district court that the underlying complaints cannot be read to allege events that happened in the coverage territory. Under well-established principles of insurance law, the place of the injury—not the place of some precipitating cause—determines the location of the "event" for coverage purposes. Further, the underlying complaints do not allege that any injuries resulted from the activities of a CACI employee who was in Iraq for a "short time." Requiring St. Paul to defend CACI on the mere possibility that some employee may have been briefly in Iraq would allow the policies' exception to non-coverage to swallow the rule. We thus decline to extend CACI's coverage beyond the plain terms of its policies and affirm the judgment of the district court.

## I.

## A.

In 2003, CACI International entered into three contracts with the United States government to provide logistical and intelligence support for U.S. operations in Iraq.* This work included screening and interrogating detainees at Abu Ghraib and other prisons in Iraq. Also in 2003, CACI took out a one-year "Commercial General Liability Protection" policy with St. Paul, which provided that St. Paul would defend CACI against any suit for covered injuries or damage and would indemnify CACI for up to $2 million. *See* Policy TE09001851 ("Policy A"), March 31, 2003. CACI renewed this policy for an additional year in March 2004. For purposes of this case, the two policies are identical in all material respects and we will refer to them as "the policies."

The policies covered "bodily injury" that was "caused by an event." Policy A at 2. They in turn defined "event" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* They also obligated St. Paul to pay any legally required damages for "covered personal injury" that was "caused by a personal injury offense." *Id.* But with one exception, the policies limited coverage to specific geographic areas, stating:

> We'll apply, and make payments under, this agreement:
>
> - only in the coverage territory; and

*The suit involves four appellants: three named insureds, CACI International, Inc., CACI Inc. Federal, and CACI N.V.; and CACI Premier Technology, Inc., which is a wholly-owned subsidiary of CACI Federal. Because all four appellants were covered by the St. Paul policies, we consider their coverage as a group and refer to them collectively as "CACI."

- only for covered injury or damage that's caused by events or offenses which happen or are committed there.

*Id.* at 5. The "coverage territory" was defined as the United States, its territories and possessions, Canada, and Puerto Rico. But the policies also stated that:

[W]e'll also apply, and make payments under, this agreement in the coverage territory for covered injury or damage that's caused by events or offenses which happen or are committed in the rest of the world if:

. . .

- they result from the activities of a person whose home is in the coverage territory, but is away from there for a short time on your business . . . .

*Id.* Therefore, the policies included a "short time" exception to the general bar on coverage outside the home territory.

In the summer of 2004, CACI was sued by two groups of former Iraqi detainees and their survivors who alleged torture and abuse by CACI employees at Abu Ghraib and other prisons in Iraq. The first suit accused CACI and another corporation of implementing an ongoing "torture conspiracy" that, it alleged, the defendants began in 2001 with the goal of profiting by extracting "intelligence" through torture. *Al Rawi v. Titan Corp.*, No. 3:04-CV-01143, ¶¶ 72, 74, 76 (S.D. Cal. filed June 9, 2004) (the "*Saleh* complaint"). The complaint alleged that the torture conspiracy "exist[ed] separate and apart from the ongoing lawful operations" of the defendants, and included specific actions such as stripping detainees, threatening them with dogs, kicking them, and forcing them to watch family members being tortured. *Id.* ¶¶ 74, 90(b), (e),

91, 97(d). Finally, the complaint alleged negligent supervision and hiring on the part of CACI. *Id.* ¶¶ 274-76.

The second lawsuit made similar allegations. It claimed that CACI employees had beaten detainees, deprived them of food, stripped and photographed them, and forced them to witness violent attacks on their relatives. *Ibrahim v. Titan Corp.*, No. 1:04-CV-1248, ¶¶ 36(a)-(b), 39(e)-(f), 44(d) (D.D.C. filed July 27, 2004) (the "*Ibrahim* complaint"). The complaint also alleged that CACI and other defendants had "engaged in an ongoing, multi-year pattern of criminal conduct for which the enterprise has earned . . . millions of dollars in profits." *Id.* ¶ 60. Because of the similarities in the two complaints, the *Saleh* case was transferred to the U.S. District Court for the District of Columbia, where it was consolidated with *Ibrahim* for purposes of discovery. *Saleh v. Titan Corp.*, 436 F. Supp. 2d 55, 59-60 (D.D.C. 2006).

## B.

When St. Paul received notice of these complaints, it notified CACI that it believed the alleged abuses did not implicate St. Paul's duty to defend or indemnify under the policies. In March 2008, CACI filed a declaratory judgment action in federal district court in Virginia, seeking a declaration that St. Paul was obligated under the policies to defend CACI in both lawsuits. St. Paul countered that it had no duty to defend or indemnify CACI. Both parties filed motions for summary judgment.

In July 2008, the district court granted St. Paul's motion for summary judgment and denied CACI's. *See CACI Int'l v. St. Paul Fire & Marine Ins. Co.*, 567 F. Supp. 2d 824, 835 (E.D. Va. 2008). In considering whether St. Paul had a duty to defend, the district court applied the Eight Corners Rule, which requires courts "'to compare the four corners of the insurance policy against the four corners of the underlying complaint [to determine] if any allegations may potentially be

covered by the policy.'" *Id.* at 829 (quoting *Capitol Envtl. Servs., Inc. v. N. River Ins. Co.*, 536 F. Supp. 2d 633, 640 (E.D. Va. 2008)).

While affirming the importance of the Eight Corners Rule, the district court noted that few courts have discussed what evidence is "intrinsic" to the complaint and may be considered along with it. The court therefore compared the Eight Corners Rule to the "well-established Four Corners Rule," which limits what federal courts may consider when ruling on a Fed. R. Civ. P. 12(b)(6) motion to dismiss. *Id.* at 831. Under this rule, the Fourth Circuit has held that courts may consider the complaint itself and any documents that are attached to it. *Id.* (citing *Sec'y of State for Def. v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)). This circuit has also held that courts may consider a document that the defendant attaches to its motion to dismiss if the document "'was integral to and explicitly relied on in the complaint and if the plaintiffs do not challenge its authenticity.'" *Id.* (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)). Applying those standards to the Eight Corners Rule, the district court concluded that it would consider documents outside the complaint if (1) they were attached to the complaint; or (2) the complaint explicitly relied on the documents and no party challenged their authenticity. *Id.* at 832.

The court therefore looked at two documents attached as Exhibits A and D to the *Saleh* complaint: a job posting for linguistic support positions with "Team Titan," a collaboration between CACI and other corporations; and a military report on Abu Ghraib that discussed the involvement of two CACI employees in abuses there. *See id.* The court also considered CACI's contracts with the U.S. government, which it concluded were "expressly incorporated into the complaints," noting that "several of [the detainees'] legal claims [were] predicated on the contractual relationships created by" the contracts. *Id.* Further, CACI had not challenged the contracts'

authenticity and had even offered them as evidence to support its motion for summary judgment in the *Saleh* proceeding. *See id.* Finally, the district court noted that, in addition to the policies at issue here, CACI had a Global Policy with St. Paul that covered events outside the policies' coverage territory but specifically excluded Iraq. Although the Global Policy was not part of the underlying complaints, its provisions were described in a declaration attached as Exhibit E to CACI's complaint in the declaratory judgment action.

After comparing these documents—along with the complaints themselves—to the St. Paul policies, the district court concluded that CACI could not invoke coverage under the short time exception because the "alleged activities, by their very nature, [were] not indicative of a brief overseas business trip, but rather of a more permanent presence in Iraq." *Id.* The court also held that the claims of negligent supervision and hiring in the *Saleh* complaint did not allege activities within the United States because "the factual predicate for such claims arises from the underlying tortious conduct of the employee," all of which took place in Iraq. *Id.* at 835. CACI now appeals.

## C.

Because we have diversity jurisdiction in this case, we apply the choice of law rules of the forum state—in this case, Virginia. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). Virginia insurance law applies "the law of the place where an insurance contract is written and delivered." *Buchanan v. Doe*, 431 S.E.2d 289, 291 (Va. 1993). Because St. Paul delivered the policies to CACI in Virginia, we apply Virginia law. We review a grant of summary judgment *de novo*. *Fuisz v. Selective Ins. Co. of Am.*, 61 F.3d 238, 241 (4th Cir. 1995).

II.

A.

This case is not about the conduct of the war in Iraq. It is simply a case about certain principles of insurance. It is also not a case about whether coverage could exist, but whether it did. Principles of insurance law in Virginia, as elsewhere, are solicitous of insureds. For example, ambiguous terms in a policy are construed against the insurer, who wrote the policy and presumably could have written it more clearly. *E.g.*, *Fuisz*, 61 F.3d at 242. And as CACI points out, doubts over coverage are typically to be resolved in favor of the policyholder and against a limitation of coverage. *See Am. Reliance Ins. Co. v. Mitchell*, 385 S.E.2d 583, 585 (Va. 1989).

Likewise, it is well-recognized that an "insurer's obligation to defend is broader than its obligation to pay." *Brenner v. Lawyers Title Ins. Corp.*, 397 S.E.2d 100, 102 (Va. 1990). For while the duty to defend is based on the allegations in the underlying complaint, the duty to indemnify relies on litigated facts. Policyholders often pay more to insure against the costs of defending lawsuits, even those that are ultimately unsuccessful. *See Perdue Farms, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 448 F.3d 252, 257-58 (4th Cir. 2006). Therefore, Virginia and other states recognize the "potentiality rule," wherein "an insurer's duty to defend is triggered if there is any possibility that a judgment against the insured will be covered under the insurance policy." *Bohreer v. Erie Ins. Group*, 475 F. Supp. 2d 578, 584 (E.D. Va. 2007). St. Paul must therefore defend CACI against the detainee lawsuits if there is any potential that the policies would cover the claims alleged in the underlying complaints. *See, e.g.*, *Va. Elec. & Power Co. v. Northbrook Prop. & Cas. Ins. Co.*, 475 S.E.2d 264, 265-66 (Va. 1996).

But the duty to defend is not without limits. To implicate the duty, the underlying complaint must allege some facts on

which the insurer would be liable. Therefore, even construing policies in favor of the insured, and even considering Virginia's potentiality rule, "if it appears clearly that the insurer would not be liable under its contract for any judgment based upon the allegations," the duty to defend will not attach. *Brenner*, 397 S.E.2d at 102.

It is also important to resolve disagreements over the duty to defend—which is after all a collateral matter—as early as possible in litigation. That is why Virginia and other states have adopted the Eight Corners Rule, which requires courts to look primarily at the underlying complaints and the insurance policy to determine if there is a potential for coverage. *E.g.*, *Am. Online, Inc. v. St. Paul Mercury Ins. Co.*, 207 F. Supp. 2d 459, 465 (E.D. Va. 2002). This rule serves a salutary purpose: it prevents courts from conducting an intensive factual analysis at an early stage of the proceedings, which would only increase litigation costs and needlessly tax parties and courts before the underlying suit had barely begun. Moreover, permitting courts to consider evidence outside the complaint would not only lead to duplicative factual inquiries in determining the duty to defend and the duty to indemnify, but "would render the two duties indistinguishable and thus effectively depreciate the duty to defend." *Capitol Envtl. Servs.*, 536 F. Supp. 2d at 642.

Therefore, the district court properly began its inquiry by looking at the complaints themselves. *See CACI Int'l*, 567 F. Supp. 2d at 832. It is less clear, however, whether the district court properly extended its inquiry by considering those documents attached to or relied on by the complaints. On the one hand, looking beyond the complaint might become a slippery slope. On the other hand, considering documents attached to the complaint would not entail the extensive factual inquiries or lengthy litigation that the Eight Corners Rule seeks to prevent. As the district court noted, we have held in the Rule 12(b)(6) context that courts may look at documents that the defendant attaches to its motion to dismiss. *E.g.*, *Trimble Nav-*

*igation Ltd.*, 484 F.3d at 705. But those cases are partly motivated by concerns that a plaintiff could prevail on a motion to dismiss by selectively quoting documents in the complaint without providing their full context; therefore, courts can prevent such manipulation by considering the documents in their entirety when presented by the defendant. *See Trigon Healthcare*, 367 F.3d at 234. But there is no apparent need in the insurance context to counter possible manipulations by the plaintiff in the underlying complaint.

Because the question is a matter of state insurance law rather than of federal procedure, and because Virginia courts have not signaled a readiness to look beyond the underlying complaint, we will decline to consider those documents attached to the complaints or on which the complaints in the underlying action rely. Moreover, we find it unnecessary to consider these documents because, as we hold below, the allegations in the complaints themselves foreclose the possibility of coverage under the territorial provision or "short time" exception of the policies.

### B.

To assess whether St. Paul has a duty to defend in this case, we first ask whether the abuses alleged in the underlying complaints took place inside the coverage territory. To answer this question, we look initially to the policies to determine the scope of coverage. As noted, the policies agree to defend against suits seeking damages for "covered injury . . . that's caused by events or offenses which happen or are committed in the [coverage territory]," which includes the United States and its territories as well as Canada and Puerto Rico. Policy A at 5. It is undisputed that all of the alleged abuse took place in Iraq.

Nevertheless, CACI argues that some of the alleged activities took place in the coverage territory because the *Saleh* complaint alleges negligent supervision and hiring, and these

activities (according to CACI) took place in Virginia, California, and elsewhere in the United States. *See Saleh* Complaint ¶¶ 274-76. CACI notes that the policies provide coverage for "events or offenses which happen or are committed [in the coverage territory]," Policy A at 5, and that the "'event' causing the alleged injury [was] CACI's acts of negligent hiring and supervision." Brief for Appellants at 43.

This argument fails for two reasons. First, the complaint does not allege that the negligent supervision took place outside Iraq: it alleges only that CACI "acted negligently and directly harmed Plaintiffs . . . by failing to take appropriate steps to supervise those persons performing Interrogation Services." *Saleh* Complaint ¶ 275. The complaint does not state from where CACI directed its supervision, and in fact suggests negligence on the part of those directly supervising ongoing interrogations in Iraq. Therefore, it is not clear that these allegations on their face implicate events in the coverage territory.

More importantly, however, even assuming that the complaint alleges activities that happened in the United States, the great weight of case law holds that it is the location of the injury—not of some precipitating cause—that determines the location of the event for purposes of insurance coverage. *See Farmers Alliance Mut. Ins. Co. v. Salazar*, 77 F.3d 1291, 1296 (10th Cir. 1996) (collecting cases). The reasons for a "place of the injury" test are clear. As the district court noted, applying a "cause in fact" test would let plaintiffs sweep any number of worldwide events into the ambit of a domestic policy as long as the underlying complaint alleged negligent supervision. *CACI Int'l*, 567 F. Supp. 2d at 835, n.15. Therefore, a causal test would create a windfall for the insured and render "the insurer responsible for a liability for which it had not contracted." *Keystone Automated Equip. Co. v. Reliance Ins. Co.*, 535 A.2d 648, 652 (Pa. Super. Ct. 1988) (noting that if the policyholder "had wanted world-wide coverage, it could have paid a higher premium to obtain it"); *see also Hagen*

*Supply Corp. v. Iowa Nat'l Mut. Ins. Co.*, 331 F.2d 199, 202 (8th Cir. 1964) (same). If domestic policies could be stretched to this extent, global policies would become superfluous and territorial coverage limitations would lose their meaning. *Cf. Hagen*, 331 F.2d at 202-03.

The cases cited by CACI are not to the contrary. They do not speak to the location of the event but simply hold that negligent hiring and supervision can constitute "occurrences" that give rise to a duty to defend. *E.g.*, *S.F. v. W. Am. Ins. Co.*, 463 S.E.2d 450, 452-53 (Va. 1995); *Hanover Ins. Co. v. Crocker*, 688 A.2d 928, 930-31 (Me. 1997); *see also* Black's Law Dictionary 1109 (8th ed. 2004) (defining "occurrence" partly as an "event . . . that results in personal injury or property damage"). The courts in *S.F.* and *Hanover* did not consider the question before us—namely, the location of an event for coverage purposes. And most courts that have considered this question have concluded that "when determining whether a bodily injury was 'caused by an occurrence'" the focus should be "on the injury and its immediately attendant causative circumstances." *Farmers Alliance*, 77 F.3d at 1296; *Dowden v. Sec. Ins. Co. of New Haven*, 378 F.2d 46, 48 (5th Cir. 1967); *Upper Columbia River Towing Co. v. Md. Cas. Co.*, 313 F.2d 702, 705 (9th Cir. 1963); *Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co.*, 609 A.2d 440, 470 (N.J. Super. Ct. App. Div. 1992) (collecting cases).

Applying those principles to this case, it is clear that the alleged injuries and abuses took place in Iraq. The *Ibrahim* plaintiffs were held at Abu Ghraib prison, and the *Saleh* complaint alleges that plaintiffs were abused at Abu Ghraib and other prisons in Iraq. *E.g.*, *Ibrahim* Complaint ¶ 38; *Saleh* Complaint ¶¶ 2, 4, 11. Because the place of the injury is controlling, we find that the alleged injuries happened outside the coverage territory.

## C.

Next, CACI argues that the alleged abuses may be covered under the exception to the territorial coverage provision for

"injury or damage" that "result[s] from the activities of a person whose home is in the coverage territory, but is away from there for a short time on [CACI's] business." Policy A at 5. Because CACI is arguing that an exception to non-coverage applies, it bears the burden of proof. *E.g.*, *St. Paul Fire & Marine Ins. Co. v. Warwick Dyeing Corp.*, 26 F.3d 1195, 1200 (1st Cir. 1994) (collecting cases holding that the insured must prove that an exception to non-coverage applies). This rule is consistent with the premise that it is the policyholder's burden to prove that the policy covers its loss. *See, e.g.*, *Glen Falls Ins. Co. v. Long*, 77 S.E.2d 457, 460 (Va. 1953).

CACI first argues that "short time" is an ambiguous term that is undefined in the policies and that we should therefore construe it against a limitation of coverage. But under Virginia law, when words are undefined in an insurance policy, "as in the case of any other contract, the words used are given their ordinary and customary meaning when they are susceptible of such construction." *Salzi v. Va. Farm Bureau Mut. Ins. Co.*, 556 S.E.2d 758, 760 (Va. 2002) (internal quotation omitted). The word "short" has an ordinary everyday meaning: it means "brief," or "lasting only a short period of time." Webster's II New College Dictionary 1045 (3d ed. 2005).

And we can further interpret "short time" by considering its meaning in the context of the policies as a whole. *See Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 636 (4th Cir. 2005). Here, the policies each had only a one-year period of performance; therefore, travel outside the coverage territory for several weeks or more would defy the common understanding of "short time." Rather, the provision most naturally covers a brief, discrete event such as a several-day business trip abroad. And it also intends to cover the activities of a single employee—"the activities of *a person* . . . [who] is away from [home] for a short time on [CACI's] business." Policy A at 5 (emphasis added).

It is clear therefore that this limited exception cannot encompass activities of the scope and magnitude of CACI's

operations in Iraq. Looking at the complaints, we note that they allege a pattern and course of conduct that spanned several years. For example, the *Ibrahim* complaint alleges that interrogators took part in an "ongoing, multi-year pattern of criminal conduct" that led to "millions of dollars in profits over the course of their multi-year contracts." *Ibrahim* Complaint ¶ 60. And the *Saleh* complaint alleges that CACI and other defendants "described the work in Iraq as a '24 x 7' operation," ¶ 53, while both complaints repeatedly allege an "ongoing pattern and practice" of illegal acts and abuse. *E.g.*, *Saleh* Complaint ¶¶ 117-18, 134-37; *Ibrahim* Complaint ¶¶ 30-31, 34-36.

In fact, the complaints make clear that they are alleging a long-term approach to interrogation that specifically aimed to extract more information from detainees through repeated torture and humiliation. For example, the *Saleh* complaint alleges that CACI sent its employees to Iraq "to set up a 'Gitmo-style' prison at Abu Ghraib," where the interrogations at Guantanamo Bay had been "based on study and review of what practices would be most humiliating to those who practice the Muslim faith." ¶ 86. According to the complaint, CACI specifically sought employees with cultural and social knowledge of the region, and the abuses aimed to "attack[ ] and ridicul[e] [the detainees'] religious faith of Islam." *Saleh* Complaint ¶ 53, ¶ 135. Therefore, the complaints frame the alleged abuses, including beating detainees and threatening them with dogs, not as isolated incidents but as part of the "torture conspirators'" plan to "continually torture[ ] and otherwise mistreat[ ]" detainees "[b]eginning in January 2002 and continuing to present." *Id.* ¶ 137.

Moreover, the process of interrogation alleged in the underlying complaints is not one that was quickly terminated. Rather, it relied on interrogators who became more skilled as time went by and who came to know the detainees—and each other—more personally. Indeed, the *Saleh* complaint alleges that the defendants worked together in a systematic way to

use "physical and psychological coercion" to compel detainees to give over information. *Id.* ¶ 134. The intent of the interrogators, according to the *Saleh* complaint, was to "creat[e] an environment" in which continual abuse would "result in more persons 'willing' to provide so-called 'intelligence.'" *Id.* ¶ 73. Interrogation of this kind involves repetitive behavior over time, or, in the complaint's words, "a series of acts specifically designed to mentally devastate" the detainees. *Id.* ¶¶ 134-35. These descriptions make it difficult to infer that those engaged in such activities were present in Iraq for only a few days.

Nevertheless, CACI argues that there is some chance that one or more of its employees involved in the alleged abuses was in fact in Iraq for just a short time, and that the potentiality rule is so broad that any claim that is "arguably covered" implicates the duty to defend. *Donnelly v. Transp. Ins. Co.*, 589 F.2d 761, 767 (4th Cir. 1978). But while there is always a theoretical possibility that some CACI employee outside the United States for a short time had some hand in the alleged abuse, this mere possibility does not rise to the level of potentiality. For example, we held that the insurer in *Fuisz v. Selective Insurance Co. of America*, 61 F.3d 238 (4th Cir. 1995), had a duty to defend only because the underlying complaint specifically alleged conduct that was covered by the policy. *See Fuisz*, 61 F.3d at 244-45 (finding that a complaint alleging that the defendant had failed to verify the accuracy of his statements could be read to allege unintentional conduct not barred by the policy's exclusion for intentional harms). But here, the underlying complaints present no allegations of abuse resulting from the activities of a CACI employee who was in Iraq for only a short time. Therefore, CACI's protestation finds no grounding in the language of the complaints, and it cannot sustain its burden of proof.

In sum, the potentiality rule does not require us to abandon the rule of reason. *See Ellett Bros., Inc. v. U.S. Fid. & Guar. Co.*, 275 F.3d 384, 388 (4th Cir. 2001) (holding that a com-

plaint that sought injunctive relief as well as "such further relief as [the] court deems just" did not present "a factual allegation supporting a claim for damages"). For while we construe ambiguities in coverage in favor of the policyholder, there is no such ambiguity here. The term "short time" has a plain and ordinary meaning, and the complaints allege a systematic pattern of activities lasting months and even years. Presented with such a stark difference between the policies and the underlying complaints, we are not permitted to take such a massive operation and cram it into a short time exception. If we did so, the exception would swallow the policies' coverage provisions whole, and there would be no reason for an insured to ever contract for coverage broader than its policy's narrowest exception.

For the foregoing reasons, the judgment is

*AFFIRMED*.

SHEDD, Circuit Judge, dissenting:

The majority acknowledges our obligation under Virginia law to impose a duty to defend when "there is *any possibility* that a judgment against the insured will be covered under the insurance policy." *Bohreer v. Erie Ins. Group*, 475 F. Supp. 2d 578, 584 (E.D. Va. 2007) (emphasis added). None of the factual allegations in these complaints forecloses the possibility that one or more CACI employees traveled to Iraq for a short time and caused covered injuries to the plaintiffs, a scenario covered by the insurance policies' "short time" exception. In my view, this possibility requires us to reverse the decision of the district court and remand for further discovery on other material issues.