**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 08-2140**

QUAN LEWAYNE DAVIS,

                    Plaintiff - Appellant,

          v.

PRINCE GEORGE'S COUNTY, MD; ISMAEL CANALES,

                    Defendants - Appellees.

Appeal from the United States District Court for the District of
Maryland, at Greenbelt.   Deborah K. Chasanow, District Judge.
(8:05-cv-03080-DKC)

Submitted:  September 30, 2009        Decided:  October 23, 2009

Before WILKINSON, NIEMEYER, and SHEDD, Circuit Judges.

Affirmed by unpublished per curiam opinion.

Michael P. Coyle, Richard Chaifetz, Columbia, Maryland, for
Appellant.   Kevin Karpinski, Victoria M. Shearer, KARPINSKI,
COLARESI & KARP, Baltimore, Maryland, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Quan Lewayne Davis appeals the district court's adverse grant of summary judgment and dismissal of his complaint alleging violations of his civil rights as guaranteed by the Fourth and Fourteenth Amendments, as set forth in 42 U.S.C. §§ 1983, 1985 (2006), false arrest, false imprisonment, malicious prosecution, and intentional infliction of emotional distress against Defendants Prince George's County, Maryland, and Detective Ismael Canales. The charges related to Davis' arrest in 2002 and subsequent trial in Maryland state court on murder, assault, riot, and weapons charges relating to a fight and the killing of Brandon Malstrom after a homecoming party near the University of Maryland campus. On appeal, Davis challenges the district court's determination that Canales possessed probable cause to charge Davis with murder, thus establishing Canales' entitlement to qualified immunity, and its dismissal of Davis' common law malicious prosecution claim. For the reasons stated below, we affirm.

We review a grant of summary judgment de novo, CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co., 566 F.3d 150, 155 (4th Cir. 2009), viewing factual evidence in the light most favorable to Davis, against whom summary judgment was granted. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment is appropriate when no genuine issue of

2

material fact exists and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment will be granted unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented. Anderson, 477 U.S. at 248.

Davis' first claim of error is that the district court erred in its determination that Canales possessed probable cause to charge Davis with murder, thus establishing Canales' entitlement to qualified immunity. Specifically, he asserts that Canales had no probable cause to arrest Davis for Malstrom's murder, that he made material misrepresentations in his Application for Statement of Charges, and that he omitted material facts, which resulted in the improper issuance of the first degree murder arrest warrant.

Qualified immunity protects government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Utilizing a two-prong test for resolving qualified immunity claims, a court first "must decide whether the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right," Pearson v. Callahan, 555

U.S. \_\_, 129 S. Ct. 808, 815-16 (2009), and, "[s]econd, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of [the] alleged misconduct." Id. at 816 (citation omitted). Overruling Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court recently held that "courts of appeals [are] permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in [a] particular case. . . ." Pearson, 129 S. Ct. at 818. In this case, we find that "it is plain that [the] constitutional right" postulated by Davis "is not clearly established." Id. at 811, 818; see also Walker v. Prince George's County, MD, 575 F.3d 426, 429 (4th Cir. 2009).[1]

Davis bears the burden of proving that Canales "deliberately or with a reckless disregard for the truth made material false statements in his affidavit . . . or omitted from that affidavit material facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading." Miller v. Prince George's County, MD, 475 F.3d 621, 627 (4th Cir. 2007) (internal quotations and citations

---

[1] Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

4

omitted). "Reckless disregard" can be established by evidence that the officer acted "with a high degree of awareness of [a statement's] probable falsity," that is, "when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." Id. (internal quotations and citations omitted). With respect to omissions, "reckless disregard" can be established by evidence that a police officer "failed to inform the judicial officer of facts [he] knew would negate probable cause." Id. (internal quotations and citations omitted). Allegations of negligence or innocent mistake by a police officer will not provide a basis for a constitutional violation. Id. at 627-28.

To establish a constitutional violation, the false statements or omissions must be "material," that is, "necessary to the [neutral and disinterested magistrate's] finding of probable cause." Id. at 628 (quoting Franks v. Delaware, 438 U.S. 154, 155-56 (1978)). To determine materiality, a court must "excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause." Id. at 628 (quoting Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000)). If the "corrected" warrant affidavit establishes

5

probable cause, no civil liability lies against the officer. Id.

The facts underlying the case are as follows. Davis ran into an acquaintance, John Ryan Schlamp, the afternoon on November 9, 2002. Schlamp informed Davis that he was planning to go to College Park the following night to attend homecoming parties, and Davis ultimately arranged to meet Schlamp. At approximately 9:30 p.m. on November 10, 2002, Davis and his friends Jessica Pryor, Stanley Chalk, and Aaron Diggs met up with Schlamp and his friends Robert Fournier, Jake Adams, Ryan Horan, and Kenny Kahalawei at a College Park convenience store. Davis, an African American male, is 5 feet 3 inches tall. On this occasion, his hair was braided in cornrows and he was wearing a baggy navy blue velour sweat suit with a matching navy blue shirt under the sweat suit jacket. The two groups later went to a party being held at two adjoining houses on Dickenson Avenue, one of which was the residence of Scott Ehrlich, located at 7307 Dickenson Avenue.

According to the statement Davis gave police, while at the party, Davis was accused of inappropriately touching a female. Davis was asked to leave the party, but refused to do so. Davis became loud and aggressive, and Schlamp, who had been drinking, began to yell. Davis stated that he was forced to pull Schlamp away to calm him down.

6

Schlamp was becoming increasingly inebriated, loud, and antagonistic. He reported to police later that night that he had had so much to drink that he "blacked out" and did not remember much of the night's events. At one point later in the party, Schlamp reportedly screamed out, "Fuck these motherfuckers. If anyone has the balls to bring it then . . . bring it. We will kill all these mother fuckers here." Later, Schlamp, who was of mixed race, began initiating problems with a group of five to six African American men. Davis testified in his deposition that he observed one of the men in this group reaching for his hip, as if he had a gun. In response, Davis asked Pryor, Chalk, and Diggs if they had a pocket knife in the event something happened. One of his friends handed Davis a pocket knife. According to Davis, he diffused the situation with the African American men, and returned the knife to his friends.

Davis also possessed a larger knife that evening, which knife he showed to Jake Adams. Adams described the knife as "a Rambo knife. Serrated on the back, sharp."

As the party was ending, Davis realized he had lost his cell phone and went to look for it. When he returned to the front of the house, he observed Schlamp, Fournier, Adams, Kahalawei, and Horan in a confrontation with Brandon Malstrom, William Malstrom, Brandon Conheim, Matt Mitchell, and Paul

7

Speakman, who were all University of Maryland students. Schlamp had approached this group, accused them of taking his cell phone, and demanded the group give him their cell phones. Brandon Malstrom ("Malstrom") told Schlamp that he did not have his cell phone, whereupon Schlamp stated, "I am gonna kill you" and punched Malstrom in the face. While Davis asserted in his deposition that he never came within 10-12 feet of the altercation,[2] others made statements that Davis and Fournier got into the fight, and Malstrom was placed in a chokehold by Fournier. William Malstrom, Conheim, and Mitchell entered the fight, and Conheim and Mitchell observed Davis reach for something that was tucked into the back of his waist. Chalk observed the fight and described the scene as "one big bunch" of people with each "grabbing each other and then scuffling around." William Malstrom heard his brother scream out. Then someone yelled "police" and everyone scattered. According to William Malstrom's statement, his brother stumbled into the back yard. Malstrom was found about a minute later on the ground in the backyard with a stab wound in his chest. Davis fled the scene and ran to his car as police arrived, leaving with Pryor, Chalk, and Diggs.

---

[2] Davis' recollection was corroborated by Conheim at the criminal trial.

University of Maryland Police Officer Ross Bogash arrived first at the scene and took Schlamp into custody after Conheim identified Schlamp as the individual who instigated the assault. An individual thereafter told Officer Bogash that there was someone in the backyard who was injured, and he found Malstrom with a four to five inch cut on the left side of his chest, and his inner organs protruding. Malstrom was not breathing and had no pulse. He was transported to the hospital where he later died of his injuries.

Officers detained Kahalawei, Fournier, and Horan for questioning at the scene, and then released them. When Officer Bogash told Schlamp that he was being detained for assault, Schlamp spontaneously stated to the Officer, "I killed him." During the drive to the police station, Schlamp repeatedly asserted, "I killed someone tonight."

Detectives from the Prince George's County Police Department took statements from several witnesses in an attempt to determine who was involved in the assault. Conheim stated during his interview that, after Schlamp punched Malstrom in the face and Fournier put Malstrom in a chokehold, he saw "a black male with corn rows (dread-locks) dressed in dark blue-jeans and a dark blue jacket reaching for something that was tucked into the back of his waste [sic]. At that point in time, I remembered thinking that he was reaching for a gun." In

9

describing the same sequence of events, Mitchell stated to police that, "There was a kid in black leather jacket, dark blue jeans, and dreeds[sic] tied back that pulled something from []waist and was one of the kids involved." Speakman stated that, "There was also another person involved in the physical assault. He was African American 5'9" 170 lbs with corn rows. He was wearing all black. He was one of the main people threatening to physically assault people at the party. William Malstrom identified three individuals as initiating the assault on his brother, and similarly described Davis as one of those individuals who was "hands on" with his brother.

Detective Canales was selected as the lead homicide detective. He reviewed the statements of the University of Maryland police officers and the statements of Mitchell, William Malstrom, and Speakman. Canales interviewed Schlamp later in the morning of November 10, 2002, at which time Schlamp identified Davis as being present with him during the altercation with Malstrom. A statement also was taken from Fournier, who described an individual, "About 5'3" tall/Black male/Dark velvet type jacket/Dark skinned/Pants might have matched jacket/," as Schlamp's friend who was present.

On November 10, 2002, Canales filed an Application for Statement of Charges against Schlamp, charging him with first degree murder, and a judicial officer found there to be probable

cause to arrest Schlamp. The following day, Canales filed an Application for Statement of Charges against Davis, also charging him with first degree murder in Malstrom's death. The Application stated as follows:

> I, the undersigned, apply for a statement of charges and a summons or warrant which may lead to the arrest of the above named Defendant because on or about November 10, 2002 at 7307 Dickinson Ave. College Park, Prince George's County, Maryland, the above named Defendant did stab and kill the victim, Brandon James MALSTROM (W/M/8/21/82). On November 10th, 2002, at approximately 0125 hrs, Uniformed Patrol Officers responded to 7307 Dickenson Ave. College Park, Prince George's County, MD for the report of a fight. Once on the scene officers located the victim in the backyard of the residence suffering from an apparent stab wound to the chest. Officers located several witnesses on the scene that identified the co-defendant John Ryan SCHLAMP, as being one of three subjects involved in an altercation with the victim.
>
> This co-defendant was subsequently apprehended on the scene. He later identified the def., who is a known associate, as the other subject involved in this altercation. According to witnesses, the def. and co-def. were observed striking the victim. Witnesses observed the def. pulling an unknown object from his waistband and striking the victim in the torso. According to witnesses, it was during the melee that the victim was stabbed. The victim staggered away and collapsed a short distance away. Fireboard responded and transported the victim to Prince George's Hospital. Upon police arrival, the def. was able to make his escape. On Nov. 10th, 2002, at 0645 hrs, the victim was pronounced dead by Dr. BLAIR/Physician as a result of his injuries.
>
> All these events occurred in Prince George's County, Maryland.

On the same date, a judicial officer for the District Court of Maryland for Prince George's County found there to be probable

11

cause to arrest Davis.[3]  Following his arrest, Davis denied having any involvement in the fight, and maintained that he was merely a bystander.[4]

A grand jury indicted Davis on charges of first degree murder, common law riot, first degree assault, second degree assault, and openly carrying a dangerous weapon.  On June 27, 2003, Davis was found guilty by a jury of common law riot and openly carrying a deadly weapon, but was acquitted of the murder and assault charges.  The court sentenced Davis to ten years' imprisonment for the riot conviction and three years' imprisonment, to be served consecutively, for the possession of a deadly weapon conviction.

The Court of Special Appeals affirmed Davis' convictions in an unpublished opinion on February 20, 2004. Davis filed a Petition for Post-Conviction Relief, which was denied.  Davis then filed the suit which is the subject of this appeal.

---

[3] Fournier also was arrested for Malstrom's murder.

[4] Canales later obtained a search warrant for Davis' car, and officers found a navy blue velour jacket and pants located in the trunk.  Laboratory analysis revealed the presence of blood on the pants, and the laboratory found to a reasonable degree of scientific certainty, that, based on DNA, the blood found on Davis' pants belonged to Brandon Malstrom.

In support of his civil suit, Davis claimed that Canales made several false and misleading statements in the Application for Statement of Charges. He first challenges the statement that Schlamp identified Davis as the "other subject involved in the altercation." He points to Schlamp's statement that Schlamp had "blacked out" prior to the start of the fight and could not remember exactly what had happened or who had been present, stating only that he presumed that the people present with him at the fight were those with whom he remembered leaving a friend's house, including Davis, and concludes that the statement that Davis was involved in the fight was untrue. Second, he challenges the statement that Davis was seen "pulling an unknown object from his waistband and striking the victim in the torso." While Canales reviewed witness statements that Davis was involved in the altercation with Malstrom, including those of William Malstrom, Conheim, and Speakman, and possessed witness statements that Davis reached into his waistband during the fight, Davis asserts that no witness said that he or she had seen Davis in physical contact with the victim.[5] Davis also

---

[5] While the district court likewise stated that no one had actually seen Davis making contact with the victim, a careful review of the witness' statements reveals that there was some evidence to the contrary. Specifically, Speakman identified Davis as involved in the physical assault, and William Malstrom identified Davis as one of three "principle altercators [sic]" who were "hands on" with his brother. In addition, Mitchell (Continued)

13

challenges Canales' statements that "[a]ccording to witnesses, it was during this melee that the victim was stabbed," and "[t]he victim staggered away and collapsed a short distance away." As Davis argues, the timing of the stabbing was not based on any fact stated by any witness, but rather based on inference taken from the various statements. No one saw Malstrom get stabbed, nor did anyone see Malstrom move to the rear of the house where he was found injured. As the district court found, these statements were speculation and inference by Canales, based on the facts as described by the witnesses, and based on William Malstrom's statement that "my brother ended up stumbling into the back yard."

In addition to the affirmative statements set forth above, Davis argues that Canales omitted material exculpatory facts from his warrant application that would have negated probable cause. The alleged omissions include witness statements that Schlamp, Fournier, and Kahalawei threw punches at Malstrom, that no one stated that they saw Davis make

---

stated that three to five individuals were "throwing punches" at the victim's mid-section while Fournier had him in a bear hug from behind, and that Davis, who "pulled something from [his] waist [] was one of the kids involved." Thus, this statement by Canales may not have been a misstatement at all.

14

physical contact with the victim,[6] Schlamp's statement that he "killed someone tonight" made on the way to the police station, the fact that Kahalawei was a U.S. Marine who would have been more likely to be in possession of the type of knife that killed Malstrom, and that there was no evidence that Malstrom sustained his injuries during the fight.[7]

After reviewing the "corrected" facts, disregarding Canales' alleged misleading statements, and taking into account the facts Davis believes would have been exculpatory, as the district court is required to do under Miller, 475 F.3d at 628, the district court nonetheless found that probable cause existed to support issuance of the arrest warrant. We find no error in this determination.

Probable cause to arrest deals with probabilities and depends on the totality of the circumstances; the officer's reasonable ground for belief of guilt "must be particularized with respect to the person to be searched or seized." Maryland

---

[6] Again, based upon a careful reading of the witness statements, there was evidence to the contrary.

[7] Davis is referring to speculation at the scene that perhaps Malstrom sustained his injury trying to jump over a fence in the backyard. Officers at the scene inspected the fence, but found no sign of an accident. No one saw Malstrom fall or attempt to climb the fence. Plus, the medic at the scene told one of the officers that he believed the injury was caused by a knife.

15

v. Pringle, 540 U.S. 366, 371 (2003) (citing Illinois v. Gates, 462 U.S. 213, 232 (1983), Ybarra v. Illinois, 444 U.S. 85, 91 (1979)).  Here, undisputed evidence demonstrates that Davis was involved in the fight, was seen pulling something from his waistband, and was one of only three people consistently identified as a participant in the melee.  Moreover, the evidence supported the reasonable inference that Davis stabbed Malstrom because he was identified as one of the three individuals going "hands on" with Malstrom, was seen pulling something from his waistband, and, within a short time thereafter, William Malstrom heard the victim scream out, and Malstrom was found within a minute thereafter with a four to five inch stab wound in his chest.  As the district court held, Davis "was in the right place at the right time to have stabbed Malstrom, and had taken actions consistent with being the killer, such as jumping into the fight and pulling an object from his waistband."  See e.g., Pringle, 540 U.S. at 374 (upholding probable cause to arrest finding where defendant was one of three stopped in car containing drugs and there were no indicia that any one suspect was more likely guilty than the others).  This evidence is sufficient to establish probable cause to issue the arrest warrant.

Nor does Schlamp's statement that he killed someone negate probable cause, especially in light of his extreme

16

intoxication, which makes the veracity of his statement questionable and does not remove Davis from suspicion. Moreover, the possibility that Malstrom received his injury from an accident, rather than from a stabbing, is purely speculative and does not serve to negate probable cause, given the facts supporting a stabbing injury. Finally, there is no showing that Canales displayed a reckless disregard for the truth in drafting his statement supporting probable cause for the arrest of Davis. The assumptions he made were entirely reasonable, given the statements he reviewed, the evidence that he had available to him at the time, and the chaotic circumstances surrounding the crime.

Given that there was probable cause to arrest Davis for Malstrom's murder notwithstanding the alleged misstatements and omissions in Canales' warrant application, the district court did not err in finding that Davis failed to assert any constitutional violation to a right clearly established, such that Canales was not entitled to qualified immunity. The district court's dismissal of the suit based on qualified immunity against both Canales and Prince George's County[8] is

---

[8] See Young v. City of Mount Ranier, 238 F.3d 567, 579 (4th Cir. 2001).

17

affirmed.[9]  We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED

---

[9] In light of our determination that Canales had probable cause to arrest Davis for the murder of Malstrom, and because no malice by Canales has been demonstrated, Davis' assertion of error by the district court in dismissing his common law malicious prosecution claim likewise fails and was properly rejected by the district court. See Exxon Corp. v. Kelly, 281 Md. 689, 692, 381 A.2d 1146, 1149 (1978).