In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3032

ACE AMERICAN INSURANCE COMPANY,

*Plaintiff-Appellant,*

*v.*

RC2 CORPORATION, INC., et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 5037—**William T. Hart**, *Judge.*

ARGUED DECEMBER 10, 2009—DECIDED APRIL 5, 2010

Before POSNER, MANION, and HAMILTON, *Circuit Judges.*

MANION, *Circuit Judge.* RC2 Corporation, Inc. and related entities (collectively "RC2") design and market toys that are primarily manufactured in China. ACE American Insurance Company issued commercial general liability policies to RC2 covering the period from August 1, 2003 to November 1, 2007. The policies excluded coverage of occurrences that took place within

the United States. Notwithstanding this exclusion, the district court found that the policies potentially extended coverage to injuries that occurred in the United States, if some negligent act in the process of the product's manufacturing that caused the harm occurred in another country. The court thus ruled that ACE had a duty to defend RC2 against class action lawsuits brought against it for products sold and used exclusively in the United States but manufactured in China. Because we hold that, under Illinois law, the insurance policies unambiguously excluded coverage for the alleged harm caused by exposure to defective products that occurred in the United States, regardless of where antecedent negligent acts took place, we reverse.

I.

RC2 designs, produces, and markets the popular "Thomas & Friends" toys based on the children's public television program of the same name (which is, in turn, based on the *The Railway Series* of books by British author Rev. W.V. Awdry).[1] In June and September 2007, RC2 recalled certain of its wooden railway trains and train set components that had been manufactured in China between 2005 and 2007 because they contained lead. This recall led to numerous class action lawsuits against RC2, alleging that the recalled toys were negli-

---

[1] *See* Thomas & Friends History, http://www. thomasandfriends.com/musa/Thomas.mvc/ About/History (last visited Apr. 1, 2010).

gently manufactured and tested. At this stage, neither party disputes that the underlying lawsuits relevant to this appeal are based on products sold and used exclusively in the United States.

RC2 turned to its insurers for defense and indemnification. At the time of the alleged harm, RC2 maintained two separate lines of commercial general liability (CGL) insurance. The first covered only occurrences within the United States. The second set of policies, issued by ACE, applied internationally but excluded occurrences that took place within the United States. RC2 first tendered its claims to its domestic insurer. Unfortunately for RC2, the domestic policies expressly excluded damages resulting from lead paint; this oversight erased what would have been the obvious source of coverage for injuries occurring in the United States. Citing the exclusion, the domestic insurer denied coverage. That left the ACE international policy, which excluded occurrences within the United States, as RC2's only opportunity for obtaining coverage.

ACE also denied coverage, claiming that the international policies excluded the damages in question because the occurrences took place within the United States. ACE simultaneously filed the present action seeking a declaration that it had no duty to defend or indemnify RC2. RC2 counterclaimed seeking declaratory relief and damages reflecting its defense and indemnity costs in the underlying lawsuits.

The insurance policies at issue, which were identical in all relevant respects, provided that ACE would pay

those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . . The insurance applies only to "bodily injury" and "property damage" which occurs during the Policy Period. The "bodily injury" or "property damage" must be caused by an occurrence. The "occurrence" must take place in the "coverage territory." We will have a right and duty to defend any "suit" seeking those damages.

The policies defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Coverage Territory" included anywhere in the world but excluded "the United States of America (including its territories and possessions)."

The parties filed cross-motions for summary judgment. The district court ruled that because the negligent manufacture of the products had taken place in China, which was within the coverage territory, the policies potentially covered the damages and ACE therefore had a duty to defend the claims against RC2. The court granted RC2's motion with respect to the duty to defend claims and awarded RC2 defense costs of $1,620,114.77 plus interest. The parties settled the indemnity claims and the district court dismissed them with

prejudice.[2] Thus, the only question that remains is whether ACE is obligated to pay the defense costs. ACE appeals the denial of its motion for summary judgment and the grant of summary judgment to RC2 on the duty to defend claim.

## II.

We review a district court's grant of summary judgment, as well as its construction of the CGL policy, de novo. *Health Care Indus. Liab. Ins. Program v. Momence Meadows Nursing Ctr., Inc.*, 566 F.3d 689, 692 (7th Cir. 2009). The parties agree that Illinois law applies to the key legal question presented in this diversity case: whether ACE has a duty to defend RC2 under the terms of the insurance policies. An insurer's duty to defend its insured is much broader than its duty to indemnify: to determine whether an insurer has such a duty, a court must "look to the allegations contained in the underlying complaint against the insured and compare those allegations to the relevant coverage provisions of the insurance policy" and if the facts alleged even potentially fall within the policy's coverage, the insurer has a duty to defend. *Guillen ex rel. Guillen v. Potomac Ins. Co. of Ill.*, 785 N.E.2d 1, 7 (Ill. 2003); *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 620 N.E.2d 1073, 1079 (Ill. 1993);

---

[2] The record does not reveal the terms of the settlement agreement, but the stipulation of dismissal for the other claims provided that the settlement would have no effect on the duty to defend claims.

*Outbound Marine Corp. v. Liberty Mutual Ins. Co.*, 607 N.E.2d 1204, 1220 (Ill. 1992). Ambiguous terms are construed against the drafter but, in construing a policy, "governing legal authority must, of course, be taken into account as well, for a policy term may be considered unambiguous where it has acquired an established legal meaning." *Nicor, Inc. v. Associated Electric & Gas Ins. Serv. Ltd.*, 860 N.E.2d 280, 286 (Ill. 2006).

It is undisputed that the underlying lawsuits involve damages allegedly caused by exposure to lead paint that occurred within the United States, which under the contract is entirely excluded from the coverage area. It is also undisputed that the manufacture of the products occurred within the coverage area. Therefore, the resolution of this case turns on whether, under the policies, an "occurrence" takes place at the time and at the location where any antecedent negligent acts took place. In this case the allegedly negligent manufacture and testing of the defective products took place in China. ACE argues that Illinois law establishes that the occurrence took place in the United States, where purchasers of the toys and other products were exposed to the lead paint. RC2 argues, to the contrary, that governing Illinois law compels the conclusion that an "occurrence" takes place in China, where at least some of the negligent acts that "caused" the harm took place. The district court observed that there was no Illinois precedent directly on point for this issue. It distinguished the lines of authority presented by both parties and applied its own interpretation of the policies.

Under Illinois law, the interpretation of an insurance contract is a matter of law. *Nicor*, 860 N.E.2d at 285; *accord BASF AG v. Great Forge Am. Assurance Co.*, 522 F.3d 813, 818-19 (7th Cir. 2008). We begin by examining the language of the insurance policies itself, giving the words their plain and ordinary meaning, and if there is no ambiguity there is no need to look elsewhere. *Nicor*, 860 N.E.2d at 286. Although the term "occurrence" is itself potentially ambiguous, it is defined within the insurance policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." On its face, this language suggests that ACE's interpretation of the policies is correct, at least in the context of continuous or repeated exposure to toxic products, because accident refers to the exposure itself. On the other hand, the term "accident" is susceptible to multiple interpretations and might be considered ambiguous. But although every insurance policy must be interpreted according to its own terms to give effect to the intentions of the parties, *id.*, many insurance policies—including these—use standard language that has been developed against the backdrop of continual interpretation and reinterpretation of particular terms by the courts. Thus, as we have noted, an otherwise ambiguous term may be rendered unambiguous when it acquires an established legal meaning. *Id*.

In support of its position, ACE argues that Illinois has given an established legal meaning to the term "accident." It cites to *Great American Insurance Co. v. Tinley Park Recreation Commission*, 259 N.E.2d 867, 869 (Ill. App. Ct. 1970), for the proposition that an "accident" does not occur

"until all the factors of which it is comprised combine to produce the force which inflicts injury." The policy in question in *Tinley Park* was taken out by the town recreation commission to cover the risks it was exposed to in operating a carnival and fireworks display. Although there were no problems with the display, the clean-up crew overlooked some unexploded fireworks. The next day, a ten-year-old boy discovered two of those fireworks and took them home. A day later, he was injured when one of them exploded. The commission tendered its claims to its insurer, but the insurer rejected the claim and sought a declaratory judgment because the insurance policy stated that it "applies only to those accidents which occur during the policy period," and that it had expired by its own terms at 12:01 a.m. the day of the injury. *Id.* at 868.

The insured argued that the insurer was required to pay for the damages related to the boy's injuries, even though the explosion and injury took place after the policy had expired. Because the negligent conduct that caused the injury—the clean-up crew's failure to remove the unexploded fireworks—had occurred during the policy period, the insured insisted the policy covered the conduct. The policy stated that the insurer was required to pay damages arising "because of bodily injury . . . caused by accident." The insured reasoned that because a cause and effect relationship existed between the accident and the injury, coverage existed whenever the negligent acts that were the proximate cause of the injury took place within the policy period. Under this theory, the insurance policy would have covered the injuries caused

during the coverage period even if the injuries had not occurred until months or years later. The *Tinley Park* court rejected the equation of the terms "negligent act" and "accident" and held instead that an accident does not occur until "all the factors of which it is comprised combine to produce the force which inflicts injury." *Id.* The court found it clear that regardless of when the earlier negligent acts occurred, under its construction of the term "accident," the accident did not occur until the time of the explosion that injured the boy, on the afternoon after the policy expired. *Id.* at 868-69.

The same rule has been applied by the Illinois Supreme Court in the premises liability context. In some respects this is a close analogue here, given the territorial coverage limitation on the policies. In *Cobbins v. General Accident Fire & Life Ins. Corp.*, 290 N.E.2d 873, 879 (Ill. 1972), the insured merchant sold fireworks (sparklers) to an underage boy who incurred serious injuries while playing with them at his home. In the lawsuit for negligence against the merchant for the sale to a minor, the Illinois Supreme Court refused to treat the illegal sale at the insured's store as an "accident" for purposes of determining where the accident occurred when the minor later injured himself at home. The policy language excluded coverage for accidents occurring "away from premises owned, rented or controlled by the named insured." The court held that the policy unambiguously excluded coverage for the accident, noting that a reasonable interpretation of accident "'clearly implies a misfortune with concomitant damage to a victim, and *not the negligence which eventually results in that misfortune*.'" *Id.* at 878 (quoting *Century Mutual Ins. Co. v. S. Ariz.*

*Aviation, Inc.*, 446 P.2d 490, 492 (Ariz. 1968)) (emphasis added). This is apparently the only word from the Illinois Supreme Court on this issue. The case resolved (with one of the seven justices dissenting) a split in the line of Illinois cases.

The Illinois approach is also consistent with the general approach that most courts have taken to determining the location of an occurrence. For example, in *CACI International, Inc. v. St. Paul Fire & Marine Insurance Co.*, 566 F.3d 150 (4th Cir. 2009), the insured sought defense from its domestic insurer for damages allegedly caused by torture and abuse at Abu Ghraib and other prisons in Iraq. *Id.* at 152. The policy in question had a territorial limitation to the United States, but the insured argued that it had alleged negligent supervision of prison guards and that some of that negligent supervision occurred within the United States and was thus potentially covered by the insurance policy. The Fourth Circuit rejected the insured's argument. The court interpreted the coverage-triggering term "event"—defined identically as "occurrence" in this case—using a "place of injury" test to determine the location of the event. *Id.* at 156-57. The court noted that "the great weight of case law holds that it is the location of the injury—not some precipitating cause—that determines the location of the event for purposes of insurance coverage." *Id.* at 157; *accord Farmers Alliance Mut. Ins. Co. v. Salazar*, 77 F.3d 1291, 1296 (10th Cir. 1996) (collecting cases).

In response, RC2 does not argue that the insurance policies are ambiguous. Rather, RC2 claims that the policies unambiguously support its position that an

"occurrence" in the product liability context takes place wherever any antecedent negligent acts take place. RC2 correctly points out that Illinois courts have unambiguously adopted the so-called "cause theory." *Nicor*, 860 N.E.2d at 288 ("[T]he cause theory represents the law of Illinois."). This approach looks to the underlying cause of the harms to determine whether a series of harms constitutes a single or multiple occurrences for purposes of calculating per-occurrence deductibles or coverage limits. *Id.* In the mass product-defect context, the underlying cause is often the negligent manufacture or testing of the products, as is alleged here. For example, in *U.S. Gypsum v. Admiral Ins. Co.*, 643 N.E.2d 1226, 1259 (Ill. App. Ct. 1994), the Appellate Court of Illinois held that under a "continuous or repeated exposure" clause identical to the clause in the policies in this case, the continued manufacture and sale of asbestos insulation constituted a single occurrence for purposes of calculating the insurance deductible. In *Nicor*, the Illinois Supreme Court confirmed that "where the damages for which coverage is sought resulted from the manufacture and sale of defective products . . . , the loss will be found to have emanated from a single cause and there will be but one occurrence for purposes of applicable polices," 860 N.E.2d at 294, but found that there were multiple occurrences where multiple exposures to mercury were the result of a series of separate negligent installations of gas meters in individual homes, rather than a common negligent manufacture or sale of the meters. In neither *Nicor* nor *U.S. Gypsum* was the *location* of the occurrences relevant or discussed by the court.

RC2 argues that because Illinois has adopted the cause theory, and the relevant negligent cause took place in China, the "occurrence" also took place in China. But the cause theory is not relevant to this case: for our purposes, it is unnecessary to determine whether all of the lead paint exposure alleged in the underlying complaints was the result of a single common cause, and thus a single occurrence, or multiple causes and multiple occurrences, under the continuous or repeated exposure clause. What is important is *where* the occurrence or occurrences, however many there were, took place. The line of cases that RC2 relies on does not address this question: the cause theory applies only to the determination of the number of occurrences and neither Illinois nor any other jurisdiction, to our knowledge, has applied this test to determine where an occurrence took place.

Thus, the policies are clear that the "occurrence" that triggers coverage takes place where the actual event that inflicts the harm takes place. And based on the undisputed facts in this case, the "occurrence" here happened at the location (or locations) of the exposure itself: within the United States.

Because we hold that the insurance policies unambiguously exclude coverage of exposure to defective products that takes place in the United States, we need not rely on extrinsic factors to determine the intent of the parties in entering the agreements. But we note that the construction urged by RC2 would render the domestic and international policies in this case almost entirely redun-

dant. And because these policies use standard language, this construction would make territorial limitations in insurance policies largely irrelevant in product liability situations. Most product liability claims will at least potentially be caused by negligent acts that allegedly occur both domestically and abroad; an insurance company's duty to defend would thus almost invariably be triggered in any products liability case, regardless of where the injury happened. The only reason that lead-paint exposure was not covered by the domestic policies was an express exclusion in those policies. Indeed, RC2's own conduct in first submitting its claims arising from lead-paint exposure within the United States to its domestic insurer was entirely consistent with our holding. Moreover, it would have made little sense for RC2 to take out both international and domestic policies if its primary risk for liability would be covered under both policies. And, as the Fourth Circuit noted in *CACI*, "[t]he reasons for a 'place of the injury' test are clear": the alternative "would let plaintiffs sweep any number of worldwide events into the ambit of a domestic policy as long as the underlying complaint alleged negligent supervision." 566 F.3d at 157. A similar rationale applies here: adopting RC2's interpretation would allow it to sweep any domestic event into its international policies so long as it posited some antecedent negligent act that occurred someplace outside the United States. Illinois law, wisely, does not compel such a result.

In sum, under Illinois law and unless a particular policy contemplates a different definition, an accident occurs when and where all the factors come together at once to

produce the force that inflicts injury and not where some antecedent negligent act takes place. Thus, under the policies in question here, the accident that constitutes the policy-triggering occurrence takes place at the location of the exposure to lead paint, not at the location where the products were manufactured and painted. Because the parties agree that all the alleged exposure to the products took place within the United States, these occurrences took place in the excluded coverage area of the ACE international policies.

## III.

Thus, for the reasons discussed above, the policy-triggering "occurrences" took place in the United States, outside the coverage territory, and thus do not even potentially fall within the policies' coverage. ACE does not have any duty to defend RC2 in the underlying suits. Accordingly, the decision of the district court is REVERSED and the case is REMANDED with instructions to enter judgment in favor of the appellants.