In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-3427

AUTO-OWNERS INSURANCE COMPANY,

*Plaintiff-Appellee,*

*v.*

JOSHUA M. MUNROE, et al.,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 08 CV 02181—**Harold A. Baker**, *Judge.*

ARGUED FEBRUARY 17, 2010—DECIDED JULY 22, 2010

Before RIPPLE, MANION, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* After Joshua Munroe and his wife entered a settlement agreement that released those who allegedly caused a severe tractor-trailer accident from any individual liability above their liability insurance coverage, Auto-Owners Insurance Company brought a declaratory judgment action to establish that the insurance policy limited coverage to $1,000,000. The district court agreed with Auto-Owners and granted its

motion for summary judgment. The Munroes appeal, arguing that the coverage limit was higher either under the terms of the policy or under minimum limits required by the Motor Carriers Act. Because the policy unambiguously limits coverage to $1,000,000 and the federal minimum limits are inapplicable here, we affirm.

## I.

On November 6, 2006, Joshua Munroe sustained significant injuries when the tractor-trailer he was driving in the northbound lane of Illinois Route 1 in Edgar County, Illinois, struck the rear of a southbound tractor-trailer driven by Monty Murphy, and then careened into a fiery head-on collision with Roger Snyder's tractor-trailer, which was following close behind. Murphy had been attempting to pass yet another tractor-trailer, this one operated by Gerald Sturgeon. When he saw Munroe approaching, Murphy attempted to pull back into his own lane but could not completely clear Munroe's lane. Munroe was air-lifted from the scene. He suffered severe burns and broken bones throughout his body and incurred medical expenses in excess of $474,000.

All three southbound trucks were owned and operated by Wayne Wilkens Trucking and had been traveling in convoy. All were covered under a single insurance policy issued by Auto-Owners. The policy declarations listed each of the tractor-trailers (and many others), and each declaration specified a limit of $1,000,000 for each occurrence. The policy also contained a Combined Limit of Liability provision, which stated that the maximum

total coverage was the $1,000,000 limit stated in the declarations, regardless of how many automobiles were listed in the declarations or involved in the accident.

Munroe and his wife sued Wilkens and the drivers of the tractor-trailers. They alleged that all three drivers acted negligently: Sturgeon by failing to yield and letting the second pass at a safe time and place, Murphy by passing when unsafe, and Snyder for following too closely and failing to avoid the head-on collision. All three tractor-trailers were allegedly exceeding the posted speed limit. Wilkens was allegedly negligent in hiring and training the drivers.

The Munroes entered a partial settlement agreement in which they agreed to release Wilkens and the drivers from any individual liability above their liability insurance coverage in exchange for $903,449.48, the remainder of the $1,000,000 coverage limit after property damage was paid to the owner of Munroe's tractor-trailer. The agreement acknowledged that Auto-Owners would seek a declaratory judgment that the limit of the liability insurance coverage under the policy was in fact $1,000,000. The Munroes reserved the right to proceed with their case if the court determined the coverage limit was greater than $1,000,000.

As anticipated, Auto-Owners brought the present suit for declaratory judgment against the Munroes. Both sides moved for summary judgment. The district court granted summary judgment to Auto-Owners, holding that the insurance policy unambiguously limited coverage to $1,000,000 for each occurrence and dismissing the

Munroes' additional argument that federal law mandated at least $2.25 million insurance. The Munroes appeal.

## II.

The Munroes advance two arguments. First, they argue that the Auto-Owners policy provided at least $3 million of coverage, either because each vehicle was subject to a separate $1,000,000 limit or because the accident constituted three separate occurrences, with a $1,000,000 limit each, due to the separate negligent acts of each of the drivers. Second, they argue that even if the policy is construed against them, federal law mandates at least $750,000 worth of insurance coverage for each vehicle and that we should read the policy as providing a minimum of $2.25 million coverage for this accident. We consider each argument in turn.

## A.

We review the district court's grant of summary judgment, and its construction of the insurance policy, de novo. *Ace Am. Ins. Co. v. RC2 Corp.*, 600 F.3d 763, 766 (7th Cir. 2010). The parties agree that Illinois law governs the interpretation of the insurance policy in dispute. Like any contract, an insurance policy is construed according to the plain and ordinary meaning of its unambiguous terms. *Nicor, Inc. v. Associated Elec. & Gas*, 860 N.E.2d 280, 286 (Ill. 2006). Ambiguity exists only where a term is susceptible to more than one reasonable interpretation. *Id.*

The insurance policy at issue in this case is not ambiguous. It provides up to $1,000,000 of coverage per occurrence for each insured vehicle. The policy contains a severability clause, which provides that the coverage applies separately to each person against whom a claim is made "except as to our limit of liability." The "Combined Limit of Liability" provision, which replaces the limit of liability provision referenced in the severability clause, provides that the per-occurrence limit—$1,000,000—is the most that Auto-Owners will pay, "regardless of the number of automobiles shown in the Declarations . . . or automobiles involved in the occurrence." While the Munroes attempt to find ambiguity, including in the terms "automobiles" and "combined," these contortions merit little discussion here: applied to the facts of this case, the unambiguous terms of the policy limit the coverage to $1,000,000 for each occurrence, notwithstanding the involvement of three Wilkens tractor-trailers.

Thus, the only question of any real substance is whether there was more than one "occurrence" here. The policy defines an occurrence using the same language that the Illinois courts have interpreted many times in the past: "an accident that results in bodily injury or property damage and includes, as one occurrence, all continuous or repeated exposure to substantially the same generally harmful conditions."

The parties agree that Illinois has adopted the "cause theory" to determine the number of occurrences under an insurance policy for purposes of coverage limitations

of deductibles. Under the cause theory, the number of occurrences is determined according to the number of "separate and intervening human acts" giving rise to the claims under the policy. *Nicor*, 860 N.E.2d at 294.

But the cause theory (like the opposing effect theory) answers a question that presupposes there are several discrete events. All of the Illinois cases applying the cause theory involve multiple discrete events rather than an uninterrupted continuum: the only question is whether all of the discrete events should be attributed to a common cause. Most recently, for instance, the Illinois Supreme Court concluded that the deaths of two boys due to negligently maintained property constituted two occurrences despite a common cause under an exception to the cause theory. *Addison Ins. Co. v. Fay*, 905 N.E.2d 747, 756 (Ill. 2009). Previously, in *Nicor*, the court found that there were multiple occurrences when separate negligent acts of various employees caused nearly two hundred discrete exposures to mercury contamination. 860 N.E.2d at 286. Before *Nicor*, the Illinois Appellate Court's relevant decisions all involved multiple claims or injuries. For example, the negligent manufacture and sale of asbestos building materials gave rise to a single occurrence despite many claims of exposure. *U.S. Gypsum Co. v. Admiral Ins. Co.*, 643 N.E.2d 1226, 1259 (Ill. App. Ct. 1994). And a single trucker caused two "occurrences" when his separate act of negligence following an initial collision with his tractor-trailer caused a second collision five minutes later. *Illinois Nat'l. Ins. Co. v. Szczepkowicz*, 542 N.E.2d 90, 91 (Ill. App. Ct. 1989).

Whether there is a single continuous event or several discrete events will not always be obvious, but in this case we have a helpful guidance from Illinois Appellate Court precedent. In *Szczepkowicz*, a truck driver stopped his tractor-trailer in the middle of a state highway, blocking both northbound lanes. 542 N.E.2d at 91. An automobile struck the rear wheels of the tractor-trailer, and the driver then moved his vehicle forward enough to free up most of one lane, but failed to completely remove the vehicle from the travel lanes. *Id.* Five minutes later, a second vehicle traveling northbound smashed into the side of the tractor-trailer. *Id.* Lawsuits arose from both collisions and the truck's insurer sued for a declaratory judgment to establish its maximum liability. *Id.* The insurer argued that both collisions constituted a single accident, but the appellate court, applying the cause theory, held that the two collisions resulted from two separate causes: when the driver moved the tractor-trailer after the first collision, he negligently failed to clear all lanes, and this separate and intervening act caused a second accident five minutes later. *Id.* at 92. The two collisions were not the result of a "single force, nor an unbroken or uninterrupted continuum that, once set in motion, caused multiple injuries." *Id.*

None of these cases implies, as the Munroes claim, that the cause theory can be used to turn a single discrete event into multiple occurrences. Unlike *Szczepkowicz*, this case does involve a single force and an uninterrupted chain-reaction involving several vehicles, and thus a single continuous occurrence. Although there may have been

several causes for the uninterrupted events, none of these causes occurred after the force that caused the injury had been set in motion. In other words, even if the causes could properly be called separate, none were *intervening* causes. All of them came together at the same time to produce a single set of circumstances that caused a single accident: Munroe's truck collided with one Wilkens truck and then, out of control, hit the following truck head-on. He has one claim against the trucking company and the drivers, allegedly caused by three separate acts of negligence. This single claim gives rise to a single occurrence under the insurance policy, with a $1,000,000 limit.

In sum, no Illinois court has held that a single claim or injury can give rise to multiple occurrences merely because several acts of negligence combined to produce a single result. There is no indication that the Illinois Supreme Court would reach such a result, contrary to common sense and the Illinois courts' own interpretation of the cause theory.

### B.

The Munroes also argue that the federal Motor Carriers Act, 49 U.S.C. § 13906(f), and its implementing regulations, requires that the three Wilkens tractor-trailers involved in the accident have a combined coverage of at least $2.25 million. This is so, according to the Munroes, because Wilkens satisfied its obligation under federal law to ensure a minimum amount of funds is available to pay damages caused to the public by its trucks by in-

cluding an MCS-90 endorsement in the insurance policy. The MCS-90 endorsement, they argue, requires a minimum of $750,000 coverage for each vehicle involved in the accident.

The MCS-90 provides that Auto-Owners "[a]grees to pay, within the limits of liability described [in the endorsement], any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles." The form also clearly states that "the limits of [Auto-Owner's] liability for the amounts prescribed in this endorsement apply separately, to each accident." While the endorsement in the record has not been filled in with a specific amount of coverage, the minimum coverage scheduled on the second page of the endorsement is $750,000 for a for-hire vehicle with a gross weight of 10,000 pounds or more carrying nonhazardous property.

No court, to our knowledge, has discussed how the MCS-90 applies when more than one insured vehicle under the same endorsement is involved in the same accident—a rather unusual set of facts, especially in this case. We are skeptical of the Munroes' argument that the MCS-90 applies per-vehicle as well as per-accident, in light of our precedent applying the MCS-90 on a strictly per-accident basis even when an accident involves more than one injured party. *See Carolina Cas. Ins. Co. v. Estate of Karpov*, 559 F.3d 621, 625 (7th Cir. 2009).

But we need not answer this question here because the MCS-90 is inapplicable for a more fundamental reason: there is no final judgment in this case, so Auto-Owners'

payment obligation under the MCS-90 has not been triggered. Moreover, because the Munroes have agreed to release Wilkens from any liability beyond what the insurance policy provides, there will never be an unpaid final judgment in this case: the parties have settled and the underlying case will presumably be dismissed once this declaratory judgment action is complete. Under its terms, the MCS-90 simply requires an insurance company to pay "any final judgment recovered against the insured for public liability resulting from negligence in the operation . . . of motor vehicles subject to the financial responsibility provisions of [the Motor Carrier Act]."

The Munroes attempt to escape the impossibility of a triggering final judgment in this case by arguing that the MCS-90 requirements are relevant because they set the minimum insurance amounts, and that we should effectively amend the policy to provide that amount. But this is not how the MCS-90 works. The insurer guarantees payment of a final judgment against the insured, but "all terms, conditions and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company." The payment obligation is broader than the policy itself and applies regardless of "whether or not each motor vehicle is specifically described in the policy," and despite any "condition, provision, stipulation, or limitation contained in the policy." Thus, an insurer is required to pay even if, for example, the insured operates a leased vehicle not shown in the declarations or the accident is caused by a type of event excluded by the policy. In other words, the MCS-90 does not modify

the terms of the policy, but instead obliges the insurer to pay up to $750,000 of a final judgment regardless of the terms of the policy.

Rather than modify the policy to which it is attached, the MCS-90 creates a suretyship among the injured public, the insured, and the insurer, under which the insurer agrees to guarantee a minimum payment to the injured public, regardless of whether the injury would, in fact, be covered by the policy. *See Carolina Cas. Ins. Co. v. Yeates*, 584 F.3d 868, 881 (10th Cir. 2009). Under this suretyship, the insurer is only obliged to pay what the insured actually owes, and then only if that debt arises from a final judgment. *See id.* at 881 ("The essence of suretyship is the undertaking to answer for the debt of another. The surety's liability is coextensive with that of the debtor and arises only when the debtor fails to discharge his duties or to respond in damages for that failure." (quoting Peter A. Alces, The Law of Suretyship and Guaranty § 1:1 (2009))). And, ultimately, the insured is liable for any payment beyond the policy limits: the MCS-90 expressly provides that "the insured agrees to reimburse the company for any payment made by the company . . . for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement."

Because of this, when an injured claimant releases a motor carrier from liability beyond the coverage limits of its insurance policy, there can be no liability that the insurer is responsible for under the MCS-90. This is true

regardless of whether the settlement amount is greater or less than the liability limits mandated by the MCS-90. The MCS-90 guarantees payment of a final judgment up to a certain amount; it does not guarantee a minimum settlement amount.

Otherwise, the release would be ineffective: because the motor carrier would ultimately be responsible for the payment in excess of the policy limits, a finding of additional liability against the insurer would be tantamount to additional liability against the insured. Here, the Munroes released Wilkens from any liability above the coverage provided by the insurance policy, and Auto-Owners has agreed to pay its coverage limit under the policy, which we have determined to be $1,000,000 and which is unaffected by the MCS-90. Therefore, there never will be an unpaid final judgment for more than $1,000,000 in this case.

### III.

Accordingly, we hold that the insurance policy unambiguously limits coverage to $1,000,000 per occurrence and that there was a single occurrence in this case because there was a single continuous event. Further, the MCS-90 endorsement does not affect Auto-Owners' liability because it applies only if triggered by an unpaid final judgment against Wilkens. Therefore, we AFFIRM the judgment of the district court.