# IN THE SUPREME COURT OF IOWA

No. 15–1161

Filed April 1, 2016

**MARLIN LEE JUST, NOELLE MARIE MARCHANT HUGHES,** and **TRAVIS CLINTON HUGHES,**

Appellants,

vs.

**FARMERS AUTOMOBILE INSURANCE ASSOCIATION** d/b/a **PEKIN INSURANCE,**

Appellee.

---

Appeal from the Iowa District Court for Warren County, Randy V. Hefner, Judge.

The drivers of two vehicles that collided with a wrong-way SUV appeal the grant of summary judgment to the SUV driver's insurer in a declaratory judgment action, arguing there was more than one "accident" for purposes of the insurance policy's limits on liability. **AFFIRMED.**

Ken A. Winjum of Hausmann-McNally, SC, Norwalk, and Dan T. McGrevey, Fort Dodge, for appellants.

Kermit B. Anderson of Finley, Alt, Smith, Scharnberg, Craig, Hilmes & Gaffney, P.C., Des Moines, for appellee.

**MANSFIELD, Justice.**

This case requires us to determine whether a chain-reaction collision resulting in separate impacts seconds apart involved one "accident" or two. A semi-tractor-trailer collided with an SUV that was being driven in the wrong direction on a highway. The semi was forced onto the right shoulder of the highway, the SUV was destroyed, and the SUV's driver was killed. Not more than seconds later, a motorcyclist ran into the totaled SUV that was still in the middle of the highway.

The drivers of both the motorcycle and the semi suffered injuries and brought a declaratory judgment action against the insurer of the SUV. They sought a declaration that there had been two accidents rather than one for purposes of the insurance policy's per-accident limit on bodily injury liability.

Both sides filed motions for summary judgment. The district court granted the insurer's motion and denied the plaintiffs' cross-motion. On appeal, we now affirm. We conclude that under the terms of the SUV driver's insurance policy there was only one accident. As we explain more fully herein, a single-accident interpretation is faithful to the terms of the insurance policy, which states that the per-accident limit applies "regardless of the number of . . . [v]ehicles involved in the auto accident." Additionally, a single-accident interpretation is consistent with the approach taken by the great majority of jurisdictions.

## I. Background Facts and Proceedings.

On April 29, 2011, at approximately 4:50 a.m., Marlin Just was driving his semi-truck southbound on US Highway 5 near Hartford. US Highway 5 is a divided highway in that area with two lanes in each direction. Suddenly, Just encountered a Chevy Tahoe SUV heading in the wrong direction (i.e., northbound) on his side of the highway. He

took evasive action but was unable to avoid a collision. The SUV, driven by John Crivaro, struck the trailer on Just's vehicle right behind the tractor.

Crivaro was not wearing a seat belt and was ejected from the SUV and killed. Just managed to maintain control of the semi, which came to a stop approximately two to three hundred feet from the site of impact. Just turned on his hazard lights and called 911.

Meanwhile, Travis Hughes's motorcycle was following Just's semi in the same southbound direction. Hughes saw the semi with its hazard lights on pulling off to the right side of the road. Hughes began to slow down his motorcycle. Hughes moved to the left lane and noticed small pieces of debris in the road, which he steered around. His headlight then illuminated "a dark blob"—Crivaro's crushed SUV—directly in his path. The SUV was blocking nearly all of the left lane and part of the right lane. Hughes could not see a safe path around the SUV and did not have time to stop. He laid his bike down on its right side and slid, colliding with the SUV.

Hughes was seriously injured in his collision with Crivaro's vehicle. He was airlifted to a Des Moines hospital where one of his legs was amputated below the knee. Just at first believed himself to be uninjured but began noticing shoulder pain during his return home after the accident. Although the amount of time that elapsed between the two collisions is disputed, all parties agree that it was no more than seconds.

The Warren County Sheriff's Office investigated the accident and prepared a report, which summarized the events.

> Vehicle #1 . . . was being driven on hwy 5 southbound by Marlin Just. Vehicle #2 . . . was being driven northbound in the southbound lanes of hwy 5 by John Crivaro. Vehicle

#3 . . . was being driven in the southbound lanes of hwy 5 by Travis Hughes.

Vehicle #2 being driven by John Crivaro was being driven on the wrong side of the hwy, causing a collision with vehicle #1 and vehicle #3.

In its conclusions, the report stated that "[t]his collision occurred due to the driving actions of John Crivaro."

Crivaro was insured by Farmers Automobile Insurance Association d/b/a Pekin Insurance (Farmers). The policy states that Farmers "will pay damages for 'bodily injury' or 'property damage' for which any 'insured' becomes legally responsible because of an auto accident." The policy is subject to a limit of liability:

LIMIT OF LIABILITY

A. The limit of liability shown in the Declarations for each person for Bodily Injury Liability is our maximum limit of liability for all damages, including damages for care, loss of services or death, arising out of "bodily injury" sustained by any one person in any one auto accident. Subject to this limit for each person, the limit of liability shown in the Declarations for each accident for Bodily Injury Liability is our maximum limit of liability for all damages for "bodily injury" resulting from any one auto accident.

The limit of liability shown in the Declarations for each accident for Property Damage Liability is our maximum limit of liability for all "property damage" resulting from any one auto accident.

This is the most we will pay regardless of the number of:

1. "Insureds";

2. Claims made;

3. Vehicles or premiums shown in the Declarations; or

4. Vehicles involved in the auto accident.

In its Declarations sections, Crivaro's policy provides for a limit of $500,000 for bodily injury for "each person[,] each accident." The policy does not define "accident."

Just and Hughes (with Hughes's spouse joining Hughes's case) filed separate suits against Crivaro's estate. Both actions sought damages for injuries sustained in the accident, which they claimed resulted from Crivaro's negligence.

Additionally, on October 6, 2014, Just, Hughes, and Hughes's spouse jointly filed a petition for declaratory judgment in Warren County District Court. Their petition asked the court to declare that "the events of April 29, 2011, constituted two accidents" under the language of Crivaro's insurance policy with Farmers. Thus, they alleged, Farmers should be held liable for "two separate policy limits of $500,000 . . . to compensate the Plaintiffs." Farmers answered on November 10, requesting in turn that the district court declare that the events constituted one accident under the insurance policy.

On March 31, 2015, Farmers filed a motion for summary judgment seeking a determination that the events of April 29, 2011, were one accident under Crivaro's insurance policy as a matter of law. The plaintiffs resisted Farmers' motion and filed their own cross-motion for summary judgment on April 15, 2015. The court held a hearing on both motions on May 15.

On June 8, the district court ruled on the motions for summary judgment. The ruling first discussed a disputed factual matter:

> The only potentially material factual dispute relates to the amount of time between the Crivaro–Just collision and the Hughes–Crivaro collision. Even viewing the evidence in the light most favorable to Plaintiffs, the second collision occurred within seconds of the first. In the end, this is not a material fact.

The district court noted that while there was no precedent from an Iowa appellate court directly addressing the issue, both a federal district court and another state supreme court applying Iowa law had concluded that the "cause test" would apply to determine the number of accidents and thus, the insurer's limit of liability.

Ultimately, the district court granted the defendant's motion for summary judgment and denied the plaintiffs' cross-motion. In doing so the district court stated,

> The policy term which limits liability "regardless of the number of vehicles involved" by necessity anticipates a multiple vehicle collision. It would be an extremely rare occurrence for three or more vehicles to collide at exactly the same time. Interpreting the policy as urged by Just and Hughes would render this policy language virtually meaningless.
>
> When read as a whole, the policy is not ambiguous. Applying the rules of construction to the undisputed facts, the injuries suffered by all Plaintiffs arose from one accident. Farmers' limit of liability for damages sustained by all plaintiffs is $500,000.

The court added, "It is not unusual in common parlance to refer to a multi-vehicle 'accident,' even though any reasonable person would understand this phrase to describe multiple collisions or impacts."

Plaintiffs appealed the ruling. We retained the appeal.

## II. Standard of Review.

"We review a district court's summary judgment ruling that interprets an insurance policy for correction of errors at law." *Amish Connection, Inc. v. State Farm Fire & Cas. Co.*, 861 N.W.2d 230, 235 (Iowa 2015). A grant of summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Boelman v. Grinnell Mut. Reins. Co.*, 826 N.W.2d 494, 501 (Iowa 2013); *accord* Iowa R. Civ. P. 1.981(3). Generally,

interpretation of an insurance policy is a question of law. *Greenfield v. Cincinnati Ins. Co.*, 737 N.W.2d 112, 117 (Iowa 2007).

### III. Analysis.

This case asks us to interpret the meaning of the word "accident" in an automobile liability insurance policy. The policy does not define the term. We have "well-settled" rules guiding the construction and interpretation of insurance policies. *Amish Connection*, 861 N.W.2d at 236. "The cardinal principle . . . is that the intent of the parties at the time the policy was sold must control." *Id.* (quoting *LeMars Mut. Ins. Co. v. Joffer*, 574 N.W.2d 303, 307 (Iowa 1998)). "Except in cases of ambiguity, we determine 'the intent of the parties by looking at what the policy itself says.' " *Id.* (quoting *Boelman*, 826 N.W.2d at 501). "If a term is not defined in the policy, we give the words their ordinary meaning." *Id.* "We will not strain the words or phrases of the policy in order to find liability that the policy did not intend and the insured did not purchase." *Id.* (quoting *Boelman*, 826 N.W.2d at 501).

" '[A] policy is ambiguous if the language is susceptible to two *reasonable* interpretations' when the contract is read as a whole." *Id.* (alteration in original) (quoting *Boelman*, 826 N.W.2d at 501). "If the policy is ambiguous, we adopt the construction most favorable to the insured." *Id.* (quoting *Boelman*, 826 N.W.2d at 502). "An insurance policy is not ambiguous, however, just because the parties disagree as to the meaning of its terms." *Id.* (quoting *Boelman*, 826 N.W.2d at 502). "Moreover, ' "[a]mbiguity is not present merely because the provision 'could have been worded more clearly or precisely than it in fact was.' " ' " *Id.* (quoting *Am. Family Mut. Ins. Co. v. Corrigan*, 697 N.W.2d 108, 114 (Iowa 2005)).

Plaintiffs contend that each collision here constitutes a separate accident and Farmers' bodily-injury liability is up to $500,000 per collision. Farmers responds that its overall liability is capped at $500,000 for bodily injury because the events of April 29, 2011, amount to one accident. We will first examine the relevant insurance policy provision in dispute, then explore how it has been interpreted in other jurisdictions.

As noted, the policy issued by Farmers to Crivaro leaves the term "accident" undefined. Yet the clause stating that the insurer's liability is limited "regardless of the number of . . . [v]ehicles involved in the auto accident" is an important clue to its meaning. *See Boelman*, 826 N.W.2d at 501 ("We read the policy as a whole when determining whether the contract has two equally plausible interpretations, not seriatim by clauses."). This language sweeps multi-vehicle events within the definition of a single accident. And if every impact constituted a separate accident, this language would have little or no meaning because the probability of more than two vehicles colliding at the same instant is very low. *Id.* at 502 ("We will not interpret an insurance policy to render any part superfluous, unless doing so is reasonable and necessary to preserve the structure and format of the provision.").

Moreover, we think what happened on Highway 5 on April 29, 2011, would be commonly described as a "multi-vehicle accident." *See, e.g., Beyer v. Todd*, 601 N.W.2d 35, 37 (Iowa 1999) (characterizing a three-collision sequence of events as a "multi-vehicle accident"); *see also Farm Bureau Life Ins. Co. v. Holmes Murphy & Assocs., Inc.*, 831 N.W.2d 129, 134 (Iowa 2013) ("When words are left undefined in a policy, we give them their ordinary meanings—meanings which a reasonable person would give them.").

Additionally, it is worth noting that the policy language here appears to be standard language that has been interpreted elsewhere. Courts in other jurisdictions typically apply the so-called "cause theory" to policies with similarly-worded liability limits. Under this approach, "the number of accidents is determined by the number of causes of the injuries, with the court asking if ' " '[t]here was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage.' " ' " *State Auto Prop. & Cas. Co. v. Matty*, 690 S.E.2d 614, 617 (Ga. 2010) (alteration in original) (quoting *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 61 (3d Cir. 1982)).

Thus, courts have found a single accident when the same negligence of the insured caused two collisions in rapid succession and the policy contained the language limiting liability "regardless of the number of . . . [v]ehicles involved in the accident." *See Auto-Owners Ins. Co. v. Munroe*, 614 F.3d 322, 325–26 (7th Cir. 2010) (applying Illinois law and finding that a multiple-vehicle collision constituted one "occurrence" for liability purposes where the collision involved "an uninterrupted chain-reaction" and the policy limited liability "regardless of the number of . . . automobiles involved in the occurrence"); *Washington v. McCauley*, 62 So. 3d 173, 178, 184–85 (La. Ct. App. 2011) (finding a single accident occurred when a semi-truck overturned and collided with two vehicles "almost simultaneously" under a policy that limited the insurer's liability "[r]egardless of the number of . . . vehicles involved in the 'accident' "); *Kan. Fire & Cas. Co. v. Koelling*, 729 S.W.2d 251, 252–53 (Mo. Ct. App. 1987) (applying the cause theory to find that one "accident" occurred in a case where the insured impacted two vehicles "almost simultaneously" and policy limited the insurer's liability "regardless of the number of . . . [v]ehicles involved in the accident").

For example, in *Munroe*, a truck driver was injured when his northbound tractor-trailer struck a southbound tractor-trailer and then "careened into a fiery head-on collision" with another southbound tractor-trailer.  614 F.3d at 323.  The court found a single occurrence. *Id.* at 326.

Courts have also applied the cause theory to find a single accident even when the policy did not contain the "regardless of the number of . . . [v]ehicles involved" qualifier and left the term "accident" or "occurrence" undefined.  *See Saint Paul–Mercury Indem. Co. v. Rutland*, 225 F.2d 689, 690–91, 693 (5th Cir. 1955) (applying Georgia law and using the cause theory to find that a vehicle and rail car collision involving multiple impacts amounted to a single accident under a policy limiting the amount of damages available in "each accident"); *Am. Cas. Co. of Reading, Pa. v. Heary*, 432 F. Supp. 995, 997 (E.D. Va. 1977) (applying Virginia law and the cause theory to an automobile accident where the policy limited insurer's liability per "occurrence"); *Hyer v. Inter-Ins. Exch. of Auto. Club of S. Cal.*, 246 P. 1055, 1057 (Cal. Dist. Ct. App. 1926) (applying the cause theory in the context of multiple-vehicle collision and finding a single accident occurred); *Bish v. Guar. Nat'l Ins. Co.*, 848 P.2d 1057, 1058 (Nev. 1993) (per curiam) (finding that one accident occurred for purposes of insurance liability where a vehicle struck the same victim twice); *Minervini v. Liberty Mut. Ins. Co.*, No. L–4686–04, 2007 WL 701593, at *1 (N.J. Super. Ct. App. Mar. 9, 2007) (per curiam) (affirming summary judgment finding one accident where a vehicle stopped short in front of the plaintiff resulting in one collision and another vehicle struck the plaintiff from behind resulting in a second collision); *Truck Ins. Exch. v. Rohde*, 303 P.2d 659, 660–61, 664 (Wash. 1956) (en banc) (applying the cause theory to find one accident where the insured collided with

three motorcycles and policy placed a limit on the amount payable in "each accident" without defining "accident"); *Olsen v. Moore*, 202 N.W.2d 236, 238, 241 (Wis. 1972) (finding there was one accident when the insured hit two oncoming vehicles and the policy limited "bodily injury liability" to "$10,000 each person," and "$20,000 each occurrence"); *see also* 7A Am. Jur. 2d *Automobile Insurance* § 431 (2007) ("Where a single, uninterrupted cause results in all of the injuries and damage, there is only one 'accident' or 'occurrence.' ").

A leading insurance treatise summarizes the law as follows:

> With regard to automobile liability insurance, the courts have generally been of the opinion that such "per accident" clauses should be construed on the basis of the cause of the accident rather than its effect; consequently, they hold that where one proximate, uninterrupted, and continuing cause results in injuries to more than one person or damage to more than one item of property, there is a single accident or occurrence within the meaning of the policy limiting the insurer's liability to a given amount for each accident or occurrence.

12 Steven Plitt, et al., *Couch on Insurance 3d* § 170:7, Westlaw (database updated Dec. 2015).

Under the cause theory, courts have determined that more than one accident occurred when an intervening cause demarcated the collisions. *See Banner v. Raisin Valley, Inc.*, 31 F. Supp. 2d 591, 593–94 (N.D. Ohio 1998). For instance, if the driver maintained or regained control of his or her vehicle before going on to hit a second car (or to hit the first again), the collisions can be deemed separate accidents. *See Liberty Mut. Ins. Co. v. Rawls*, 404 F.2d 880, 880–81 (5th Cir. 1968) (per curiam) (finding that two accidents occurred for purposes of liability limit where the insured struck two vehicles with a five-second interval between the collisions while fleeing from law enforcement because there was no evidence that the insured lost control of his vehicle); *Amberge v.*

*Lamb*, 849 F. Supp. 2d 720, 721–22, 726 (E.D. La. 2011) (finding that four separate accidents occurred where driver impacted other vehicle "at four distinct points in time" and driver had maintained control of his vehicle throughout the impacts); *Ill. Nat'l Ins. Co. v. Szczepkowicz*, 542 N.E.2d 90, 93 (Ill. App. Ct. 1989) (finding that two accidents had occurred where five minutes elapsed between impacts and negligent driver had moved his vehicle but left it blocking the road after the first collision). As part of this analysis, courts examine the time and space interval between the collisions. *Welter v. Singer*, 376 N.W.2d 84, 87 (Wis. Ct. App. 1985) ("If cause and result are so simultaneous or so closely linked in time and space as to be considered by the average person as one event, courts adopting the 'cause' analysis uniformly find a single occurrence or accident."); *see Banner*, 31 F. Supp. 2d at 593–94 (collecting cases).

> According to the Kansas Supreme Court,
>
> Collisions with multiple vehicles constitute one occurrence when the collisions are nearly simultaneous or separated by a very short period of time and the insured does not maintain or regain control over his or her vehicle between collisions. When collisions between multiple vehicles are separated by a period of time or the insured maintains or regains control of the vehicle before a subsequent collision, there are multiple occurrences.

*Am. Family Mut. Ins. Co. v. Wilkins*, 179 P.3d 1104, 1114 (Kan. 2008). Nevertheless, "[w]hile timing is frequently a part of the analysis, the courts place the most emphasis on whether or not one source of negligence set all the subsequent events in motion." *Johnson v. Hunter*, 688 S.E.2d 593, 596 (S.C. Ct. App. 2010).

Courts have noted that the cause theory is founded in the purpose of liability coverage. As the Washington Supreme Court reasoned,

> The insured and the insurer intended by this contract to indemnify the insured's *tort* liability to third persons. Such liability arises from a negligent act on the part of the insured which is the proximate cause of an injury. The absence of proximate cause precludes tort liability. Proximate cause is an integral part of any interpretation of the words 'accident' or 'occurrence,' as used in a contract for liability insurance which indemnifies the insured for his tortious acts.

*Rohde*, 303 P.2d at 662.

An alternative approach, the "effect theory," considers the number of accidents from the perspective of the injured parties. *See Zurich Am. Ins. Co. v. Goodwin*, 920 So. 2d 427, 432–33 (Miss. 2006) (applying Iowa law and the cause theory but noting that if Mississippi law were to apply, the court would view the policy from the perspective of the injured). The effect theory appears to have originated in a case involving an oil well blow-out. *See Anchor Cas. Co. v. McCaleb*, 178 F.2d 322, 324–25 (5th Cir. 1949) (finding that a well blow-out that lasted for approximately fifty hours and deposited considerable amounts of oil, sand, and mud on the properties of various owners was not a single accident because "the injury to each individual is a separate accident"). We are unaware of any jurisdiction that has actually applied the effect theory to motor vehicle accidents, although in *Goodwin*, the court indicated that Mississippi *would* apply that theory.

A problem with the effect theory under our law is that it directs the court to construe a contract term, "accident," from the perspective of one who was not party to the insurance contract. This does not accord with our general rule of interpreting insurance policies to give effect to the intent of the parties. *See Amish Connection*, 861 N.W.2d at 236. Furthermore, the application of the effect theory makes less intuitive sense given that the purpose of a liability limit is to cap the amount of risk the insurer is willing to cover relative to the premium paid. As

several courts have noted, if the cap were based on the number of claimants, injured parties, or even collisions, it would lose much of its significance. *See Rutland*, 225 F.2d at 692 ("[C]onsideration of the amount stated in relation to the claimants damaged rather than the [cause] would make the policy potentially limitless."); *Heary*, 432 F. Supp. at 997 (rejecting the effect theory because it would grant "unlimited coverage to any insured involved in an accident" and "it would be impossible for the insurance industry to set a premium on an unlimited potential obligation").

In *State Farm Mutual Automobile Insurance Co. v. Howard*, No. 87–2152, 1988 WL 45461, at *1 (4th Cir. 1988) (per curiam), the court declined to follow the effect theory in holding that a sequence of two collisions involved only one accident. The *Howard* facts in some respects resemble our own. A series of vehicles were traveling west on the interstate. *Id.* Suddenly, a truck appeared in their lane heading the wrong way. *Id.* One of the vehicles collided head-on with that truck, and then another vehicle struck that vehicle, and perhaps the truck as well, "as it passed through the scene of the collision." *Id.* The court rejected the effect theory and reasoned,

> We agree with the judgment of the district court that there is no ambiguity in the term "accident" and therefore no required interpretation in favor of the insured, or, in this case, claimants. We also agree that the district court acted properly in finding that ordinary people "normally use the word 'accident' to describe the *event,* no matter how many persons or things are involved."

*Id.* (quoting *Rutland*, 225 F.2d at 691).

Under a third alternative, the so-called "event theory," a court considers the number of events that happened. New York and West Virginia follow the event theory. *See Hartford Accident & Indem. Co. v.*

*Wesolowski*, 305 N.E.2d 907, 909–10 (N.Y. 1973) (holding there was one "occurrence" under the event test when the insured vehicle struck one oncoming vehicle, ricocheted off, and struck a second vehicle more than 100 feet away and noting that there was "no intervening agent" and "in common understanding and parlance there was . . . a single, inseparable 'three-car accident' "); *Shamblin v. Nationwide Mut. Ins. Co.*, 332 S.E.2d 639, 644 (W. Va. 1985) (applying the event theory, which "equat[es] 'occurrence' with a single liability-triggering 'event,' regardless of the details of how or why the event happened").

It has been noted that the event theory and the cause theory are not mutually exclusive. *See Wilkins*, 179 P.3d at 1112. In some instances, application of either theory will lead to the same result. *See Matty*, 690 S.E.2d at 618 n.1. In other instances, it may not. For example, in *National Liability & Fire Insurance Co. v. Itzkowitz*, 624 F. App'x 758, 763 (2d Cir. 2015), the United States Court of Appeals for the Second Circuit recently applied the event theory under New York law to find three separate accidents. In that case, a dump truck struck and damaged an overpass. *Id.* at 760. The dump box separated from the truck, landed in the highway, and was struck by a vehicle. *Id.* Then another vehicle struck the dump box. *Id.* The court emphasized that the second collision between vehicle and dump box was "unrelated" to the first. *Id.* at 763. "We would be facing a different set of facts . . . if, for example, the [first] vehicle had ricocheted off the dump box before hitting the [second] vehicle. There might then have been an unbroken chain between the second and third collisions." *Id.*

The event theory, however, seems problematic to us because it is not clear how the "event" concept advances the analysis. Is event just another word for accident? In *Itzkowitz,* the court indicated that the

event test focuses on "temporal proximity," "spatial proximity," and "whether the incidents are part of the same causal continuum." *Id.* at 761–62. In the Second Circuit's view, "the second incident did not play a role in causing the third and . . . the relative timing between the two incidents played no role in the third incident's occurrence." *Id.* at 763.

In the present case, the district court relied on the *Matty* decision of the Georgia Supreme Court that applied the cause theory to the identical policy language. *See Matty*, 690 S.E.2d at 616. *Matty* answered a question certified to the Georgia Supreme Court: A federal district court wanted to know "how to determine the meaning of the term 'accident' in an automobile liability insurance policy" that does not define the term and how to determine the number of accidents "when an insured vehicle strikes one claimant and then very shortly thereafter strikes another." *Id.*

The insured driver in that case ran into a bicyclist with her vehicle, killing him, and then went on to hit a second bicyclist, who was seriously injured. *Id.* The two collisions occurred approximately one second apart and were separated by a distance of twenty feet. *Id.*

State Auto, the insurer, utilized the same language in its limit of liability provision as Farmers:

> The insured's policy with State Auto contains a limit of liability for bodily injury of $100,000 for "each accident." The policy also provides, in part, that this limit of liability is the "maximum limit of liability for all damages resulting from any one auto accident. This is the most [State Auto] will pay regardless of the number of: 1. 'Insureds'; 2. Claims made; 3. Vehicles or premiums shown in the Declarations; or 4. Vehicles involved in the auto accident." The policy does not define "accident," "each accident," or "any one accident."

*Id.* (alteration in original). The bicyclists sought a determination that each collision constituted a separate accident under the policy, while

State Auto argued that the two impacts were part of a single accident and it was only liable for bodily injury up to $100,000. *Id.*

The Georgia court began by examining the language of the policy and noting the "clear intent" of policy to limit liability resulting from multiple-vehicle accidents. *Id.* at 617. As the court explained,

> Automobile accidents involving multiple vehicles and multiple injured parties (insureds and third parties) are an everyday occurrence on our roads. Recognizing this reality, this contractual language contemplates that there can be a single accident in which there are multiple vehicles, injured parties, and claims and provides that for that type of accident, there will be a liability limit of $100,000.

*Id.* The court then rejected the injured parties' construction of the term "accident," stating,

> Defining accident as urged by the claimants—that is, by the number of impacts regardless of how close in time and place they occurred—would mean that there can never be one accident and a $100,000 limit of liability in a multiple vehicle collision, because it is virtually impossible for multiple vehicles to collide truly simultaneously . . . .

*Id.*

In comparing the ways to delineate an accident when the term is left undefined by an insurance policy, the court observed that the cause theory was "the clear majority rule." *Id.* After discussing the effect theory and the event theory, the court adopted the cause theory as best effectuating the intent of the parties and most compatible with methods for computing insurance rates. *See id.* at 618–19. The court added, "[T]he cause theory is more consistent with Georgia tort law than the effect and event theories, recognizing that liability insurance is designed to cover damages for the torts of the insured." *Id.* at 619.[1]

---

[1]After the Georgia Supreme Court answered the certified question, the parties re-filed their summary judgment motions in federal district court in Georgia. *State Auto Prop. & Cas. Co. v. Matty*, 719 F. Supp. 2d 1377, 1379 (M.D. Ga. 2010). The court

Several years ago, the Mississippi Supreme Court forecast that Iowa would follow the cause theory. *See Goodwin*, 920 So. 2d at 439–40. In *Goodwin*, an eighteen-wheel truck licensed in Iowa and owned by an Iowa company failed to stop upon encountering a traffic backup in Mississippi. *Id.* at 431. The truck hit eight other vehicles. *Id.* The applicable insurance policy contained a one million dollar limit of liability "per accident." *Id.* at 430. The district court found that Mississippi law applied, awarded summary judgment to the injured parties, and held that, under the policy, "there were eight (8) accidents with $1 million coverage for each accident, or stated differently, $1 million in liability coverage per vehicle struck." *Id.* at 432.

The Mississippi Supreme Court reversed. *Id.* After determining that Iowa, rather than Mississippi, law applied, the court examined the insurance policy provisions in question. *Id.* at 436, 438. The policy described the limit of liability as the most the insurer would "pay for the total of all damages . . . resulting from any one 'accident,' " "[r]egardless of the number of covered 'autos', 'insureds', premiums paid, claims made or vehicles involved in the 'accident.' " *Id.* at 438. The policy also defined the term "accident" as "[a]ll 'bodily injury', 'property damage' and 'covered pollution cost or expense' resulting from continuous or repeated exposure to substantially the same conditions." *Id.*

According to the court, the heart of the matter was whose perspective should govern:

> If viewed from the perspective of the insured, the event will be looked at as to its "cause" by the tortfeasor. Then all the collisions will be considered part of the same "accident"

---

denied the motions because there were "genuine issues of material fact as to whether [the driver] regained control over her vehicle after the first collision such that a reasonable jury could conclude that there was a second intervening cause and therefore a second accident." *Id.* at 1381.

because they were the result of one continuing "cause". If viewed from the perspective of the injured party, the court will look to the "effect" on the injured party. Then the collisions will be considered part of different "accidents" because as to each injured party, it was not a continuing event but new and independent.

*Id.* at 438–39. Upon an examination of our precedent, the court concluded that Iowa would view the policy from the viewpoint of the insured, i.e., the tortfeasor. *Id.* at 439–40.[2] Applying the definition from the insured's policy, the court held that all the collisions resulted from "one continuing exposure" and, thus, they were all part of a single accident. *Id.* at 440.

Under the majority cause theory, what happened on Highway 5 on April 29, 2011, amounts to only one accident. Farmers' insured, Crivaro, drove in the wrong direction on the highway, causing a collision with Just's semi in which Crivaro's SUV was totaled. Seconds later, Hughes's motorcycle ran into Crivaro's demolished SUV that was still in the middle of the highway. Crivaro never regained control of the SUV; indeed, he was killed in the first collision. Crivaro's presence on the wrong side of the highway set this rapid-fire sequence of events in motion, and this type of chain reaction is the quintessential situation the cause theory was intended to resolve. The undisputed facts do not reveal any intervening or superseding cause. *Cf. Rawls*, 404 F.2d at 880. Both

---

[2]In arriving at this conclusion, the court considered our prior decisions in *American Family Mutual Insurance Co. v. Petersen*, 679 N.W.2d 571 (Iowa 2004), *Farm & City Insurance Co. v. Potter*, 330 N.W.2d 263 (Iowa 1983), and *Central Bearings Co. v. Wolverine Insurance Co.*, 179 N.W.2d 443 (Iowa 1970), and then relied on language from *Potter*:

At the outset we should note that this insurance contract is a liability policy which insures the tort feasor, not the victim. Thus, whatever constituted an accident—absent policy language to the contrary—should be decided from the viewpoint of the tort feasor.

330 N.W.2d at 265.

impacts resulted from an unbroken causal chain—the collisions were closely related in space and time and trace their origins to a single cause. The parties dispute the time gap between the collisions; however, we agree with the district court that this dispute does not alter the analysis. According to every witness's testimony, the gap can only be measured in seconds.

In fact, this is a particularly strong case for finding a single accident under the cause theory. Because the insured was ejected and killed in the initial collision, there is no conceivable argument that additional tortious conduct by the insured contributed to the second collision. Just and Hughes rely on the Illinois Appellate Court's decision in *Szczepkowicz,* but its facts are quite different on this critical point. In *Szczepkowicz,* the insured truck lacked a working left rear side clearance light. 542 N.E.2d at 91. When the driver of this truck was stopped in traffic, an automobile struck him from behind. *Id.* Thereafter, the driver failed to remove the truck from the roadway, and five minutes later, another vehicle ran into the truck. *Id.* The court noted,

> [The driver] should have had knowledge, especially after the [first] accident, of the danger imposed by his obstruction of the northbound lanes in the fog. His failure to remove his vehicle completely, which was still operable, from the northbound lanes after the first accident created a different set of conditions and constituted a separate cause of the second collision.

*Id.* at 93. The court added, "This is not a situation where, after the initial impact, one vehicle immediately 'ricochets' off the other and within seconds collides with a third." *Id.* That distinguished situation is essentially the circumstance we have here.

Just and Hughes also direct our attention to a decision of the Ohio Court of Appeals, *Miller v. Motorists Mutual Insurance Co.,* 965 N.E.2d

369 (Ohio Ct. App. 2011). Again, the facts are distinguishable. In *Miller*, a distracted driver veered into a group of motorcycles, producing a series of collisions. *Id.* at 370. Thus, almost immediately after hitting the first motorcycle (0.3 seconds), the driver continued and struck a second motorcycle. *Id.* The driver and passenger on the second motorcycle argued that they had been injured in a separate accident. *Id.*

The negligent driver's insurance policy contained language similar to the wording of the Farmers policy. *See id.* at 371. It provided a limit of liability and stated the limit was the most the insurer would pay

regardless of the number of:

1. Insureds;

2. Claims made;

3. Vehicles or premiums . . . in the Declarations; or

4. Vehicles involved in the auto accident.

*Id.* The trial court found there "was one continuous course of conduct" and consequently, one accident. *Id.* at 370–71.

The Ohio Court of Appeals reversed. *Id.* at 373. In doing so, the court decided that the insurer's failure to include a definition for the term "accident" in the policy resulted in an ambiguity that should be construed against the insurer. *Id.* The court also observed that the contrary interpretation reached in other Ohio cases "was dictated by the inclusion of a standard policy definition of the term 'accident' as 'a sudden, unexpected and unintended event, or a continuous or repeated exposure to substantially the same conditions.' " *Id.* at 372; *see Banner*, 31 F. Supp. 2d at 592; *Progressive Preferred Ins. Co. v. Derby*, No. F–01–002, 2001 WL 672177, at *3 (Ohio Ct. App. June 15, 2001). The court concluded,

> We would agree with the trial court had [the insurer] included the phrase "continuous or repeated exposure to substantially the same conditions" in its policy, but it did not. Thus, as a matter of contract interpretation, the results *cannot* be the same.

*Miller*, 965 N.E. 2d at 373.

Significantly, the facts of *Miller* depart somewhat from those of the present case. In *Miller*, although the time gap was very short, the negligent driver potentially had a separate opportunity to avoid the second accident.

In any event, in the past we have taken a different approach to interpreting insurance policies than the Ohio court did in *Miller*. As we have indicated before, the fact that additional clarifying language could have been included in the policy does not thereby render an insurance policy ambiguous. *See Amish Connection*, 861 N.W.2d at 236; *Corrigan*, 697 N.W.2d at 114; *Fraternal Order of Eagles v. Ill. Cas. Co.*, 364 N.W.2d 218, 221 (Iowa 1985). Furthermore, the language "continuous or repeated exposure to substantially the same conditions"—which is used in commercial general liability policies, *see, e.g.*, *Pursell Constr., Inc. v. Hawkeye-Sec. Ins. Co.*, 596 N.W.2d 67, 70 (Iowa 1999); *Dico, Inc. v. Emp'rs Ins. of Wausau*, 581 N.W.2d 607, 612 (Iowa 1998)—seems less helpful in an automobile policy context.[3]

Thus, we think the policy language "regardless of the number of . . . [v]ehicles involved in the auto accident" provides sufficient clarification for purposes of this case. As we have already noted, in common vernacular a multi-vehicle accident took place. Furthermore,

---

[3]It is also noteworthy that in another case, the Ohio Court of Appeals found there was only one accident when an intoxicated person drove his car "through a crowd of people gathered around a bandstand and injured more than 20 of those people before his car struck another vehicle and came to a stop" even in the absence of the "continuous or repeated exposure" language. *Greater Cincinnati Chamber of Commerce v. Ghanbar*, 810 N.E.2d 455, 455–57 (Ohio Ct. App. 2004).

we believe the prevailing cause theory should apply here. That theory is consistent with Iowa's existing approach to insurance policy interpretation. Under that theory, no cause intervened between the truck–SUV collision, in which Crivaro was killed and his SUV was wrecked, and the motorcycle–SUV collision seconds later. Additionally, only a minimal span of time elapsed. Therefore, we find that the single accident limit on bodily injury liability in the Farmers policy unambiguously applies under the facts of this case.

## IV. Conclusion.

We affirm the judgment of the district court.

**AFFIRMED.**