# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 24-2347

———————————————

Denise J. Child

*Plaintiff - Appellant*

v.

Unum Life Insurance Company of America

*Defendant - Appellee*

——————————

Appeal from United States District Court
for the Northern District of Iowa - Eastern

——————————

Submitted: November 18, 2025
Filed: May 11, 2026

——————————

Before BENTON, GRASZ, and STRAS, Circuit Judges.

——————————

STRAS, Circuit Judge.

Does a long-term-care insurance policy in Iowa cover losses that occurred before it went into effect? Although Denise Child thinks so, the district court[1] disagreed. So do we.

---

[1]The Honorable Leonard T. Strand, United States District Judge for the Northern District of Iowa.

I.

Over 40 years ago, Child lost the use of her arms and legs after a car accident. She has needed substantial help with basic activities like bathing, dressing, and eating ever since. Despite her limitations, she worked as a speech therapist at an Iowa education agency for over three decades.

Midway through her time there, the agency began offering group long-term-care insurance. The policy, issued by Unum Life Insurance Company of America, covered nursing-home, assisted-living, and home-care expenses. *See Collins v. Metro. Life Ins. Co.*, 117 F.4th 1010, 1015–16 (8th Cir. 2024) (describing long-term-care insurance). It was "guaranteed issue," meaning that preexisting conditions were no barrier to coverage. *See, e.g.*, *Crowne Invs., Inc. v. Bryant*, 638 So. 2d 873, 875 (Ala. 1994) (explaining that a "guaranteed[-]issue" policy is one offered "regardless of health history").

Before enrolling, Child had questions about how the policy worked. She consulted specialists within her own agency, who told her that Unum *would* issue the insurance if she chose monthly benefits at or below the $6,000 mark. If she opted for more, however, she would need to answer questions about her medical history. She went with the guaranteed-issue option.

But one provision, what the parties call the "existing-loss provision," still worried her. It carved out "loss[es] of [an ability to perform a daily living activity]" that already existed on the "effective date of coverage." Among the activities listed were "bathing," "dressing," "toileting," "transferring," "continence," and "eating," none of which she could do without help. Although Unum denies she ever called about the carveout, it is undisputed that, if she did, the full extent of her condition never came up. Based on the limited information she shared, the representative reportedly told her that the provision would not affect her right to future benefits. With her questions answered, she enrolled by completing a benefit-election form.

When she saw the existing-loss provision in her Certificate of Insurance, she again became concerned. She contacted one of the specialists from before, who assured her that preexisting conditions would not stand in the way of benefits. She also allegedly called Unum, which gave her the same advice. But like the first time, her inability to perform the listed daily activities did not come up. Based on these conversations, she decided to keep paying the premiums.

She did so for nearly 20 years, until continuing to work became too difficult. At that point, she gave notice that she was resigning and filed "a Long Term Care claim" raising her "bathing, dressing, toileting, transferring, continence, eating (cutting food), and . . . mobility" needs. The problem for her, at least in Unum's eyes, was that those limitations had existed on the day she enrolled, which brought the existing-loss provision into play. On that basis, Unum denied the claim.

Upset about the denial and convinced that Unum had misled her decades before, she sued for breach of contract, fraudulent misrepresentation, and bad faith in state court. After removing the case to federal court, the insurer moved for summary judgment. Over a cross-motion from Child, the district court sided with Unum and dismissed the case.

II.

We review the grant of summary judgment de novo. *See Cincinnati Ins. Co. v. Rymer Cos.*, 170 F.4th 1159, 1162 (8th Cir. 2026). It is proper when there is "no genuine issue of material fact" and "the evidence, viewed in a light most favorable to the nonmoving party, shows . . . the [party seeking it] is entitled to judgment as a matter of law." *Id.* (alteration in original) (citation omitted).

Like most insurance disputes, summary judgment here depends on the terms of the policy. Everyone agrees that Iowa law applies, so "the intent of the parties at the time the policy was sold . . . control[s]." *Just v. Farmers Auto. Ins. Ass'n*, 877 N.W.2d 467, 471 (Iowa 2016) (citation omitted). Intent depends on "what the policy

itself says." *Id.* (citation omitted); *see Boelman v. Grinnell Mut. Reinsurance Co.*, 826 N.W.2d 494, 501 (Iowa 2013) ("The plain meaning of the insurance contract generally prevails."). A breach occurred if Unum unjustifiably broke its promise to pay benefits. *See Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998).

## A.

Under the "plain terms" of the policy, Unum held up its end of the bargain. *Smithway Motor Xpress, Inc. v. Liberty Mut. Ins. Co.*, 484 N.W.2d 192, 195 (Iowa 1992). As the benefit-information page made clear, the timing of losses mattered. "[E]xisting loss[es]," defined as those present on the "effective date of coverage," were "only . . . eligible for coverage" if she "recover[ed] from" them. The benefit-election form echoed the timing requirement in even clearer terms. It said that the "loss of Activities of Daily Living . . . *must* occur after your effective date of coverage under this Long Term Care plan in order to be covered." (Emphasis added); *see Christensen v. Qwest Pension Plan*, 462 F.3d 913, 916–17 (8th Cir. 2006) (considering a warning in a benefit-election form when evaluating a breach-of-fiduciary-duty claim against plan administrators).

No one disputes that Child's "effective date of coverage" was December 1, 2003. The disagreement is about its significance. Although Child believes her loss of function, which had occurred over two decades before, was just a preexisting condition, the policy took a different view. It made clear that she needed to "recover" from "existing loss[es]" before she could get benefits for them. She did not provide "acceptable proof" that she had, so while any new losses of daily activities from her preexisting condition would presumably have been covered, the policy's plain terms made clear that existing losses on the "effective date of coverage" would not be.

-4-

B.

Unless, of course, coverage came from someplace else. One possibility is a statute, which "form[s] a part of the policy . . . as if [it were] actually written in the insurance contract." *Dave Ostrem Imports, Inc. v. Globe Am. Cas./GRE Ins. Grp.*, 586 N.W.2d 366, 368 (Iowa 1998). When a conflict arises between "a policy provision" and "a statutory requirement, . . . the statute controls." *Lee v. Grinnell Mut. Reinsurance Co.*, 646 N.W.2d 403, 406 (Iowa 2002).

Iowa had a law in place when Child enrolled that limited the way long-term-care insurance policies could deal with preexisting conditions. *See Barnett v. Durant Cmty. Sch. Dist.*, 249 N.W.2d 626, 627 (Iowa 1977) (looking to statutes "existing at the time [the] plaintiffs entered their . . . contracts"). It prohibited them from "*exclud[ing] coverage for a loss* or confinement which is the result of a preexisting condition *unless the loss* or confinement *begins within six months following the effective date of coverage* of an insured person." Iowa Code § 514G.7(3)(b) (2003) (emphases added). Child reads this provision as *requiring* Unum to cover her losses because her inability to perform daily activities began before the effective date of coverage, not within the six months "following" it. *Id.*

She misreads the statute. It prevents insurers from denying coverage for losses from preexisting conditions occurring *beyond* a six-month waiting period, exactly like Child's policy does. It does not require them to cover losses that arise *before* the effective date of coverage.[2] If it did, it would create a moral hazard by allowing individuals to buy insurance and receive benefits right away for past losses.

---

[2]Nor did the absence of coverage for pre-effective-date losses need to "appear as a separate paragraph." Iowa Admin. Code § 191-39.7(4) (2003) (imposing that requirement for "limitations with respect to preexisting conditions"). The lack of coverage was due to the timing of the *loss*, not its relationship to a preexisting *condition*. *Compare Webster's Third New International Dictionary* 1338 (2002) (defining a "loss" as "a person or thing or an amount that is lost"), *with id.* at 473 (defining a "condition" as "a mode or state of being").

Her interpretation would transform long-term-care insurance from a product that protects against the "risk[] of future events" to one covering "known losses," contrary to how it is supposed to work. *Ritrama, Inc. v. HDI-Gerling Am. Ins. Co.*, 796 F.3d 962, 968 (8th Cir. 2015); *see* 7 Jordan R. Plitt et al., *Couch on Insurance* § 102:7 (3d ed. 2025 update) (stating that the rule "[i]mplicit in the concept of insurance is that the loss . . . must occur during the policy period for the insured to recover[, which] obviously excludes losses that occur before the policy is issued"). Nothing in the statute requires such a nonsensical result.[3] *See In re Det. of Geltz*, 840 N.W.2d 273, 275 (Iowa 2013) (stating that Iowa courts give statutes a "sensible and logical construction" (citation omitted)).

The statutory provision right before, which defines "preexisting condition," all but confirms our interpretation. *See Christensen v. Iowa Dist. Ct. for Story Cnty.*, 21 N.W.3d 529, 533 (Iowa 2025) ("We read statutes as a whole, . . . in harmony with surrounding provisions." (citation omitted)). "Preexisting condition[s]" include "symptoms which would cause an ordinarily prudent person to seek" or "receive[] . . . health care services within six months *preceding* the effective date of coverage." Iowa Code § 514G.7(3)(a) (2003) (emphasis added); *accord Webster's Third*, *supra*, at 1787 (defining "preexist" as "to exist earlier" or "to exist before"). In other words, identifying preexisting conditions requires looking back six months, but coverage is prospective from the "effective date" onward. Iowa Code § 514G.7(3)(a) (2003).

---

[3]The same goes for Iowa Administrative Code § 191-39.6(2) (2003). Although it said that long-term-care policies could not "limit[] or exclude[] coverage by type of illness, treatment, medical condition or accident," Child's policy does not do so. *Id.* Any of those events can cause an inability to perform daily tasks but the resulting limitations, which determine coverage, do not fall within the list. And even if they did, the policy does not single out a specific "*type* of illness, treatment, medical condition or accident," like one resulting from a car crash or affecting only an insured's arms or legs. *Id.* (emphasis added).

## C.

The reasonable-expectations doctrine also requires a glance backwards, but only to "the underlying negotiations or the inferences arising from the circumstances of when the parties entered the policy." *Boelman*, 826 N.W.2d at 506; *see Vos v. Farm Bureau Life Ins. Co.*, 667 N.W.2d 36, 50 (Iowa 2003) (explaining that the doctrine is a "narrow" one (emphasis and citation omitted)). As a "prerequisite," "circumstances attributable to the insurer [must] foster[] coverage expectations or . . . the policy is such that an ordinary layperson would misunderstand its coverage." *Boelman*, 826 N.W.2d at 506 (citation omitted). According to Child, the calls to Unum and the specialists within her own agency were "circumstances" that led her to reasonably believe that the policy covered her then-existing limitations. *Id.*

It is hard to see how any belief on her part could have been reasonable given the "plain terms" of the policy. *Smithway Motor Xpress*, 484 N.W.2d at 195. Child admits she "absolutely" reviewed it, including the provision that expressly carved out coverage for "existing loss[es] of [Activities of Daily Living]." Not to mention that the benefit-election form included an even clearer statement about when those losses had to occur: "*after* [her] effective date of coverage." (Emphasis added). Given the "clarity of" these provisions, a "reasonable person could not have understood coverage would exist." *Farm Bureau Life Ins. Co. v. Chubb Custom Ins. Co.*, 780 N.W.2d 735, 743–44 (Iowa 2010) (declining to apply the "reasonable expectations" doctrine).

Selecting the guaranteed-issue policy, which had lower monthly benefits, should not have changed those expectations. No one would think that eliminating coverage for pre-effective-date *losses* "(1) [was] bizarre or oppressive, (2) eviscerate[d] terms explicitly agreed to, or (3) eliminate[d] the dominant purpose of the transaction." *Boelman*, 826 N.W.2d at 506 (citation omitted) (listing the situations when the doctrine applies). To the contrary, the background presumption, supported by the disclaimers she saw, is that the policy only covered losses occurring

after its effective date, once she began paying premiums. *Cf. id.* at 505 (stating that the reasonable-expectations doctrine "does not expand coverage on a purely equitable basis"); *Nat'l Sur. Corp. v. Westlake Invs., LLC*, 880 N.W.2d 724, 740 (Iowa 2016) ("[W]e will not strain to interpret an insurance policy to impose liability on an insurer . . . ."). It is how insurance works. *See Couch on Insurance* § 102:7; *see also United States v. Simpson*, 538 F.3d 459, 463 (6th Cir. 2008) ("Insurance coverage, by its very nature, is forward-looking . . . .").

Regardless, her alleged communications with Unum do not bear the weight she places on them. Although her memory was "fuzzy," she never described the full extent of her condition or the limitations she already had. The omission may have been inadvertent, but under a reasonably-prudent-person standard, it does not matter. *See Am. Fam. Ins. Co. v. Corrigan*, 697 N.W.2d 108, 118 (Iowa 2005) (explaining that the measuring stick is what a "reasonable person in the insured's position" would have done). A person cannot reasonably rely on an answer given in the absence of material facts. *See Vos*, 667 N.W.2d at 50 (describing the "reliance interest" on which the reasonable-expectations "doctrine is founded" (emphasis omitted)); *see also Boelman*, 826 N.W.2d at 506 (stating that the reasonable-expectations doctrine applies when the insured "prove[s] circumstances *attributable to the insurer* that fostered coverage expectations" (emphasis added) (citation omitted)).

Nor could she reasonably rely on the answers given by the specialists she consulted. *See Clemens Graf Droste Zu Vischering v. Kading*, 368 N.W.2d 702, 711 (Iowa 1985) ("[A]n actual agency must exist before [the] principal may be held liable." (citation omitted)). The policy itself disclaimed an agency relationship with anyone acting on behalf of her employer: "For all purposes of this Policy, the [employer] acts on its own behalf or as the employees' agent. *Under no circumstances will the [employer] be deemed Unum's agent*." (Emphasis added); *see Boelman*, 826 N.W.2d at 506 (explaining that "[o]nly representations made *by the insurer* at the time of policy negotiation and issuance are relevant" (emphasis added)). And even if the specialists had been agents, the policy goes on to say that

-8-

"[n]o other person, *including an agent*, [could] change [it] or waive any part of it." (Emphasis added). For multiple reasons, in other words, the reasonable-expectations doctrine does not apply.

## III.

A few loose ends remain. One is Child's fraudulent-misrepresentation claim. *See Smidt v. Porter*, 695 N.W.2d 9, 22 (Iowa 2005) (laying out the elements). Underlying it is the alleged advice she received from Unum. The problem, however, is the same as before: any inaccuracy was the result of the incomplete information provided by Child, not any intentional deception by Unum. *See id.* (specifying that "intent to deceive" is an element).

Her bad-faith claim ends up in the same place, except the reason is that Unum had a "reasonable basis" for denying coverage under the existing-loss provision. *Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 473 (Iowa 2005) (holding that having one is a defense to a bad-faith claim). Once it did, the lack of an investigation no longer mattered. *See McIlravy v. N. River Ins. Co.*, 653 N.W.2d 323, 333 (Iowa 2002) (noting that a "flawed investigation" *may* give rise to an inference of bad faith, but not if the insurer "had a reasonable basis for denial"). Nor is there any evidence of post-claim underwriting to "avoid liability," like looking through her medical history after the fact. *St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 742 P.2d 808, 815 n.3 (Ariz. 1987) (citation omitted). Child provided all the information Unum needed to deny the claim.

## IV.

We accordingly affirm the judgment of the district court.

_____